# NATIONAL MASTER AUTOMOBILE TRANSPORTERS AGREEMENT



# For the Period of June 1, 2008 through May 31, 2011

# INDEX

Page

401(k) Savings Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Additional Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
Agency Shop Clause  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
Air-conditioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70
Americans with Disabilities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62
Appendix A, NATLD Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  93
Approval of Local Riders  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Bail, Employee's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
Barge, Piggy-back, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55
Board of Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34
Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
Brake Linings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70
Bulletin Boards, Union  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

Checkoff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
Closing of Terminals (Seniority) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
Committee on Industry Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
Company Title and Interest, Transfer of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
Compensation Claims and Paid Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
Cost-of-Living . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

Day of Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42
Definition of Terms (Seniority)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
Designation of Joint Arbitration Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
Designation of Representatives (Grievance Machinery) . . . . . . . . . . . . . . . . . . . .  28
DRIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
Driving Equipment Special License, Road and/or  . . . . . . . . . . . . . . . . . . . . . . . .  63
Driving Hours  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  81
Duration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89

Emergency Reopening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54
Employee's Bail  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
Employer Negotiating Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92
Employers Covered  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
Employment Agency Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
Extra-contract Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Family and Medical Leave Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49
Financing (Grievance Machinery) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

i

# INDEX

Page

Flooring (Motor Vehicle) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
Fuel Tank Placement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Functions of Joint Arbitration Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Funeral Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Grievance Machinery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Grievance Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Grievances (Protection of Rights) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Grievant's Bill of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Hazardous Materials (Right to Know) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Head Ramp Stops . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Health and Safety Committee and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
Health and Safety Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
Health Benefits Joint Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Heated Mirrors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Imminent Danger/Unsafe Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Joint Arbitration Committees, Designation of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Joint Health and Safety Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Jumbo Jets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Jurisdictional Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Jury Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Leave of Absence - Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Lie Detector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
List of Laid-Off Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Local Matters and Riders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Local Piggy-back (Rail) Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Local Rider Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Local Riders, Approval of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Maintenance of Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Maintenance of Standards, Employer Request for Review . . . . . . . . . . . . . . . . . . . . 22
Merger, Purchase, Acquisition, Sale, etc. (Seniority) . . . . . . . . . . . . . . . . . . . . . . . . 17
Metric System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
Military Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Modified Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Multi-Employer, Multi-Union Unit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

# INDEX

Page

NATA Negotiating Committee (Employer and Union) . . . . . . . . . . . . . . . . . . . . . . . .   92
NATLD Members (Appendix A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   93
New Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57
New Terminals (Seniority)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
Night Deliveries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68
No Strike and/or Lockout  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
Non-covered Units  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4
Nondiscrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62
Notice of Changes Which Affect Seniority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
Notice of Strike Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

Occupational Safety and Health Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81
Opening of Terminals (Seniority)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Paid Leave, Compensation Claims and  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
Parties to the Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
Passengers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62
Payment of Monetary Grievances  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
Picket Line  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
Piggy-Back, Barge, Etc.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55
Posting of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50
Preferential Hiring Obligations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
Probationary Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
Protection of Rights  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
Purchase of Equipment (Seniority) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Quick Release Ratchets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

Recognition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
Request for Wage Review Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
Retirement Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
Retraining Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
Revocation of License, Suspension or  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61
Riders, Local Matters and . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5
Right to Information (Work Preservation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   87
Right to Know (Hazardous Materials) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74
Rights-National, Area & Multi-State Joint Arbitration Committee  . . . . . . . . . . . . . .   33
Road and/or Driving Equipment Special License  . . . . . . . . . . . . . . . . . . . . . . . . . . .   63
Rules of Procedure (Grievance Machinery)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Scope of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

# INDEX

Page

Seniority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
Separability and Savings Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53
Separation of Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53
Shock Absorbers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69
Sick Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46
Single Bargaining Unit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
Skids . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74
Sleeper Cab Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  87
Staffing Request (Seniority) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
Standing Seniority Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37
Stewards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
Struck Goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
Substance Abuse Testing and Disciplinary Action . . . . . . . . . . . . . . . . . . . . . . . . . .  75
        Disposition in Event of Positive Test Result . . . . . . . . . . . . . . . . . . . . . . . . . . .  77
        Leave of Absence Prior to Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77
        Paid-for Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80
        Reasonable Cause Testing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75
        Return to Duty After a Positive Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80
        Urine Sample Kit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76
Supplements to the National Master Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
Suspension or Revocation of License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
Sympathetic Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

Tires-Recap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69
Trailer Hand Brake Valves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72
Training Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
Transfer of Company Title and Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Uniforms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  82
Union Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53
Union and Employer Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
Union Bulletin Boards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50
Union Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
Union Negotiating Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92
Union Shop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
Unions Covered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
Unsafe Operations/Imminent Danger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68
USA-Canada-Mexico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

Wage Review Form, Request for . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
Work Preservation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  83

## INDEX

Page

Work Preservation Agreements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94
    Active Truck Transport, L.L.C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97
    Allied Automotive Group, Inc.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  102
    Cassens Corporation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  107
    Jack Cooper Transport  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  112
    Signatory Employers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94
Work Preservation Board of Arbitration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  85
Work Preservation Grievance Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84
Work Preservation Local Level Hearing Procedures. . . . . . . . . . . . . . . . . . . . . . . . . .  85
Work Stoppages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
Workweek Reduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

**NATIONAL MASTER AUTOMOBILE TRANSPORTERS
AGREEMENT COVERING
TRUCKAWAY, DRIVEAWAY
AND LOCAL AGREEMENTS**

**for the period of
June 1, 2008 through May 31, 2011
covering:**

operations in, between and over all of the states, territories and possessions of the United States, and operations into and out of all contiguous territory. The NATIONAL AUTOMOBILE TRANSPORTERS LABOR DIVISION NEGOTIATING COMMITTEE representing the Automobile Transport Employers affiliated with the National Automobile Transporters Labor Division and _____

(Company)

hereinafter referred to as the "EMPLOYER,"

and

The TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS INDUSTRY NEGOTIATING COMMITTEE representing the Local Unions affiliated with the International Brotherhood of Teamsters, and Local Union No. _____ which Local Union is an affiliate of the International Brotherhood of Teamsters, hereinafter referred to as the "Union," agree to be bound by the terms and conditions of this Agreement.

1

## ARTICLE 1.
## PARTIES TO THE AGREEMENT

**Section 1.**
**Employers Covered**

The Employer consists of members of the National Automobile Transporters Labor Division, a multi-employer collective bargaining association with divisions consisting of Automobile Transporters Central-Southern Area, Eastern Area and Western Area, as listed in Appendix A, who have given their authorization to the Association to execute this Agreement and Supplemental Agreements; members of the Association who have not given such Powers of Attorney; and individual Employers who become signatory to this Agreement and Supplemental Agreements as hereinafter set forth.

**Section 2.**
**Unions Covered**

The Union consists of any Local Union which may become a party to this Agreement and any Supplement as hereinafter set forth. Such Local Unions are hereinafter designated as "Local Unions."  In addition to such Local Unions, the Teamsters National Automobile Transporters Industry Negotiating Committee representing the Local Unions affiliated with the IBT, hereinafter referred to as the "National Union Committee," is also a party to this Agreement and the agreements supplemental hereto.

**Section 3.**
**Transfer of Company Title or Interest**

The Employer's obligations under this Agreement, including Supplements, Local Riders and dispatch procedures in effect at the time of the transaction shall be binding upon its successors, administrators, executors and assigns. The Employer agrees that the obligations of this Agreement shall be included in the agreement of sale, transfer or assignment of the business. In the event an entire operation or a portion thereof or rights only are sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation or use of such rights shall continue to be subject to the terms and conditions of this Agreement for the life thereof.  Transactions covered by this provision include stock sales or exchanges, mergers, consolidation or spin-offs or any other method by which business is transferred.

On the sale, transfer or lease of an individual run or runs or rights only, or such rights are taken over by assignment, receivership or bankruptcy proceedings, the specific provisions of this Agreement, including Supplements or other conditions, shall prevail. It

2

is understood by this Section that the signator Employer shall not sell, lease or transfer such run or runs or rights to a third party to evade this Agreement.

Corporate re-organizations by a signatory Employer, occurring during the term of this Agreement, shall not relieve the signatory Employer or the re-organized Employer of the obligations of this Agreement during its term.

In the event the Employer fails to require the purchaser, the transferee or lessee to agree to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement. The obligations set forth above shall not apply in the event of the sale, lease or transfer of a portion of the rights comprising less than all of the signator Employer's rights to a nonsignator company unless the purpose is to evade this Agreement.

The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee or other entity involved in the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which the operations covered by this Agreement or any part thereof including rights only may be transferred.

Such notice shall be in writing, with a copy to the Union, at the time the seller, transferor or lessor makes the purchase and sale negotiation known to the public or executes a contract or transaction as herein described whichever first occurs. The Union shall also be advised of the exact nature of the transaction, not including financial details.

The term rights includes routes and runs.

## ARTICLE 2.
## SCOPE OF AGREEMENT

**Section 1.**
**National Master Agreement**

The execution of this National Master Agreement on the part of the Employer shall apply to all operations of the Employer which are covered by this Agreement, and shall have application to the work performed within the classifications defined and set forth in the agreements supplemental hereto.

**Article 2**

**Section 2.**
**Supplements to the National Master Agreement**

There are three (3) divisions of the Automobile Transporting Industry covered by this Agreement and for this reason Supplemental Agreements are provided for each of the specific divisions controlled by this National Master Agreement.

All such Supplemental Agreements are subject to and controlled by the terms of this National Master Agreement and are referred to herein as "Supplemental Agreements."

All such Supplemental Agreements are to be clearly limited to the specific division and classification of work as enumerated or described in each individual Supplement.

**Section 3.**
**Non-covered Units**

This Agreement shall not be applicable to those operations of the Employer where the employees are covered by a collective bargaining agreement with a Union not signatory to this Agreement or to those employees who have not designated a signatory Union as their collective bargaining agent.

When a majority of the eligible employees in any appropriate bargaining unit (including office) performing work for a signatory Employer, execute a card authorizing a signatory Local Union to represent them as their collective bargaining agent at their terminal location, then, such employees shall automatically be covered by this Agreement and the applicable Supplemental Agreements. In such cases, the parties may by mutual agreement negotiate wages and conditions, subject to Joint Area Committee approval.

In the event the Employer and the Union are unable to mutually agree to the inclusion or exclusion of individuals within the appropriate bargaining unit with sole reference to the question of their supervisory, managerial, guard or confidential status, such issue shall be resolved by a special committee appointed by the appropriate Joint Area Committee. The Committee shall meet and resolve the dispute within fourteen (14) days. Subsequent to the resolution of this issue, the parties shall ascertain whether a majority of employees included within the appropriate bargaining unit have designated the Union as their collective bargaining agent and they shall be immediately covered by this Agreement and applicable Supplemental Area Agreements. In such cases, the parties may by mutual agreement negotiate wages and conditions subject to Joint Area approval. Failure to resolve such issues will constitute a disputed Rider, subject to the provisions of Section 7 of this Article.

Notwithstanding the foregoing paragraph, the provisions of the National Master Automobile Transporters Agreement and the applicable Supplemental Agreements

4

shall be applied without evidence of Union representation of the employees involved to all subsequent additions to and extensions of current operations which adjoin and are utilized as a part of such current operations, newly established terminals and consolidations of terminals utilized as part of such current operations. The provisions of the applicable Work Preservation Article shall apply to this paragraph.

If an Employer refuses to recognize the Union as above set forth and the matter is submitted to the National Labor Relations Board or any mutually agreed upon process for determination, and such determination results in certification or recognition of the Union, all benefits of this Agreement and applicable Supplements shall be retroactive to the date of demand for recognition.

**Section 4.**
**Single Bargaining Unit**

The employees, Unions, Employers and Association, covered by this National Master Agreement and the various Supplements thereto, shall constitute one (1) bargaining unit. It is understood that the printing of this National Master Agreement and the aforesaid Supplements in separate Agreements is for convenience only and is not intended to create separate bargaining units and contracts.

This National Master Agreement applies to Truckaway, Driveaway, Local and other classifications of employment authorized by the signatory Employers to be represented by the National Automobile Transporters Labor Division and to other Employers participating in national collective bargaining. The common problems and interests, with respect to basic terms and conditions of employment, have resulted in the creation of the National Master Automobile Transporters Agreement and the respective Supplemental Agreements. Accordingly, the Employers, parties to this Agreement, acknowledge that they constitute a single national multi-employer collective bargaining unit, composed of those Employers authorizing such Association to represent them for the purpose of collective bargaining, and such other individual employers which have, or may, become parties to this Agreement.

**Section 5.**
**Local Matters and Riders**

(a) All conditions and matters considered by the Union and the Employer as "local matters" and peculiar to the operations of the Employer and not of general application to the industry, shall be treated as local matters, and such conditions are to be reduced to writing and attached to the Supplemental Area Agreements in the form of a Rider and considered to be part thereof.

**Article 2**

Riders may become effective on an interim basis by agreement between the Employer and the Local Union, provided that such Riders have been filed with the appropriate Area Joint Arbitration Committee within thirty (30) days of their implementation.  Local Riders not submitted to the appropriate Area Joint Arbitration Committee for approval within this thirty (30) day period shall be considered null and void.  If not approved or otherwise modified by the Area Joint Arbitration Committee, the Rider shall become null and void from the date of the Area Joint Arbitration Committee decision. Riders that affect the provisions of the National Master Agreement must be first approved by the National Joint Arbitration Committee.

(b) Riders to this Agreement and to Supplements thereto between Local Unions and Employers that do not meet the standards set forth in the National Master Agreement and Supplements thereto, shall be continued pending negotiations for amendment of such Riders, which negotiations shall be conducted and concluded within one hundred eighty (180) days after execution of this Agreement. All such Riders must be submitted to the Area Joint Arbitration Committee for approval or rejection. If the Area Joint Arbitration Committee cannot finally dispose of the matter, such Rider shall be null and void. However, wage and monetary matters negotiated in this Agreement shall become effective June 1, 2008.

(c) This Section shall not restrict the Union's legal right to organize.

(d) In the event a shipper transfers any work covered by a Local Rider from one signatory employer to another signatory employer, the Local Rider shall remain in effect and shall not be renegotiated unless mutually agreed to by the parties. In advance of a competitive bid involving two (2) or more signatory Employers, upon request, the Local Union shall provide to each involved signatory Employer the Local Rider and other local conditions including, but not limited to, zone rates, shuttle rates, incentive or piece work rates and other loading or unloading rates which prevail at the location involved in the competitive bid.

## Section 6.
## Approval of Local Riders

The Employer and the Union mutually agree that there may be added to an Area Supplemental Agreement any Article governing any phase of employment which they mutually deem necessary provided said change and/or Rider is signed by both parties or attached to this Agreement as a Rider or Supplement, and provided further, that such Rider or Supplement is approved by the applicable Area Joint Arbitration Committee, unless it affects provisions of the same National Master Agreement at which time same must first be approved by the National Joint Arbitration Committee. All negotiated Riders must become a part of the appropriate Area Supplemental Agreement and be attached thereto.

**Article 2**

**Section 7.**

It is understood and agreed that the Local Union and the Employer must make a concerted effort to mutually agree on Local Riders. In the event that the Local Union and the Employer cannot agree to a Local Rider within one hundred eighty (180) days from the date of execution of this Agreement, such Rider must be referred to the appropriate Area Joint Arbitration Committee, which Committee(s) shall hold hearings and attempt to adjust the dispute.

In the event the Area Joint Arbitration Committee cannot resolve the Local Rider dispute, such Committee shall submit the matter to the National Joint Arbitration Committee for determination.

It is understood and agreed that in the event the National Joint Arbitration Committee is deadlocked on the Rider dispute, then either party shall be entitled to all lawful economic recourse to support its position in this matter.

**Section 8.**

(a) Agreements may be negotiated by the Employer and the Local Union which modify the wage rates, incentives and other provisions set forth in the National Master and the applicable Supplemental Agreement and Riders for employees working in driving, loading and unloading classifications which will have the effect of permitting the Employer to acquire and retain truckaway, yard work at plants, railheads, ports and other facilities, subject to National Committee approval and the approval of the affected membership prior to implementation.

(b) Nothing in this section is intended to or shall allow a Local Union(s) and an Employer to enter into any transaction that undermines the wages, benefits or other contractual rights of employees working at any other terminal or location covered by the Agreement.

(c) In the handling of traffic from terminals or locations where modifications have been approved under Subsection (a) of this Section, foreign drivers shall be paid their full contractual rate.

**ARTICLE 3.**
**RECOGNITION, UNION SHOP AND CHECKOFF**

**Section 1.**
**Recognition**

(a) The Employer recognizes and acknowledges that the Teamsters National Automobile Transporters Industry Negotiating Committee and the Local Unions affiliated with the International Brotherhood of Teamsters are the exclusive representatives of all employees in the classifications of work covered by this National Master Agreement, and Supplements thereto for the purpose of collective bargaining as provided by the National Labor Relations Act.

Subject to Article 2 (Scope of Agreement), this provision shall apply to all present and subsequently acquired operations and terminals of the Employer.

This provision shall not apply to wholly-owned and wholly independently operated subsidiaries which are not under contract with Local IBT Unions. "Wholly independently operated" means, among other things, that there shall be no interchange of freight, equipment or personnel, or common use, in whole or in part, of equipment, terminals, property, personnel or Interstate Commerce Commission (I.C.C.) rights.

**Union Membership**

(b) All present employees who are members of the Local Union on the effective date of this subsection or on the date of execution of this Agreement, whichever is the later, shall remain members of the Local Union in good standing as a condition of employment. All present employees who are not members of the Local Union and all employees who are hired hereafter shall become and remain members in good standing of the Local Union as a condition of employment on and after the thirty-first (31st) day following the beginning of their employment or on and after the thirty-first (31st) day following the effective date of this subsection or the date of this Agreement, whichever is the later. Within seven (7) days from the date of hiring of a new employee, the Employer will give to the Union, in writing, the following information:

(1) The name, home address and social security number of the newly hired employee; and

(2) The date the employee was hired.

An employee who has failed to acquire or thereafter maintain membership in the Union, as herein provided, shall be terminated seventy-two (72) hours after his Employer has received written notice from an authorized representative of the Local Union, certifying that membership has been, and is continuing to be, offered to such employee on the same basis as all other members and, further, that the employee has had notice and

opportunity to make all dues payments. This provision shall be made and become effective as of such time it may be made and become effective under the provisions of the National Labor Relations Act, but not retroactively.

**Additional Employees**

(c) When the Employer needs additional employees, it shall give the Local Union equal opportunity with all other sources to provide suitable applicants, but the Employer shall not be required to hire those referred by the Local Union.

The Local Union and the Employer agree to prepare a list of automobile transporter employees within their area who are currently on layoff status. The Employer agrees to give all persons on the list a good faith opportunity for employment before hiring new employees to perform work covered by this Agreement. Separate lists shall be prepared for employees in separate classifications such as driver, yard, office and garage.

(d) No provision of this Article shall apply in any state to the extent that it may be prohibited by state law. If under applicable state law additional requirements must be met before any such provision may become effective, such additional requirements shall be met first.

**Agency Shop Clause**

(e) If any agency shop clause is permissible in any state where the provisions of this Article relating to the union shop cannot apply, the following agency clause shall prevail:

(1) Membership in the Union is not compulsory. Employees have the right to join, not join, maintain or drop their membership in the Union, as they see fit. Neither party shall exert any pressure on or discriminate against any employee regarding such matters;

(2) Membership in the Union is separate, apart and distinct from the assumption by one of one's equal obligation to the extent that one receives equal benefits. The Union is required under this Agreement to represent all of the employees in the bargaining unit fairly and equally without regard to whether or not an employee is a member of the Union. The terms of this Agreement have been made for all employees in the bargaining unit and not only for members in the Union, and this Agreement has been executed by the Employer after it has satisfied itself that the Union is the choice of a majority of the employees in the bargaining unit. Accordingly, it is fair that each employee in the bargaining unit pay his own way and assume his fair share of the obligation along with the grant of equal benefit contained in this Agreement;

(3) In accordance with the policy set forth under subparagraphs (1) and (2) of this Section, all employees shall, as a condition of continued employment, pay to the Union, the employee's exclusive collective bargaining representative, an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount of money equal to the Union's regular and usual initiation fees, and its regular and usual dues. For present employees, such payments shall commence thirty-one (31) days following the effective date or on the date of execution of this Agreement, whichever is the later, and for new employees, the payment shall start thirty-one (31) days following the date of employment.

(f) If any provision of this Article is invalid under federal law or the law of any state wherein this Agreement is executed, such provision shall be modified to comply with the requirements of federal or state law or shall be renegotiated for the purpose of adequate replacement. If such negotiations shall not result in mutually satisfactory agreement, either party shall be permitted all legal or economic recourse.

(g) In those instances where subsection (b) hereof may not be validly applied, the Employer agrees to recommend to all employees that they become members of the Local Union and maintain such membership during the life of this Agreement, to refer new employees to the Local Union representative, and to recommend to delinquent members that they pay their dues since they are receiving the benefits of this Agreement.

(h) To the extent such amendments may become permissible under applicable federal and state law during the life of this Agreement as a result of legislative, administrative or judicial determination, all of the provisions of this Article shall be automatically amended to embody the greater union security provisions contained in the 1947-1952 National Truckaway Agreement, or to apply or become effective in situations not now permitted by law.

(i) Supervisory or non-unit personnel shall not perform work which is recognized by the Union and the Employer as the work of employees covered by this Agreement, except when mutually agreed by the Union and the Employer and except in accordance with Article 8 (Protection of Rights), Section 3.

**Training Program**

(j)     (1) The Employer shall have the right to establish a driver (Truckaway and/or Driveaway) training program with the following understanding and conditions: (Driveaway shall not include single drive.)

**Article 3**

a. Period - In the event a truck driver applicant has prior driving experience and has a CDL, the driver training period shall not exceed thirty (30) days. The thirty (30) days shall be defined to mean fifteen (15) days driving out of a thirty (30) day period. In the event a truck driver applicant has no driving experience and does not have a CDL, the driver training period shall not exceed sixty (60) days. The sixty (60) day period shall be defined to mean a maximum of forty-five (45) days driving out of the sixty (60) day period.

b. Employer Rights-The Employer shall have the right to select applicants for the training program, establish instruction procedures and requirements, to eliminate any trainee(s) during the training period, or subsequent thereto, prior to employment.

c. All of the contract terms, including Article 3, Section 2 Probationary Employees, shall apply to the individual trainee on the first (1st) date after the training program is successfully completed and the individual performs revenue-producing work for the Employer.

d. The trainee shall be prohibited from performing any work in any classification covered by this Agreement.

e. The training program referred to in Subsection (j)(1) above shall be specifically confined to work pertaining to the classification of truckaway or driveaway driver.

f. Rates of pay for driver trainee shall be as set forth in each respective Supplement or Local Rider.

g. The Employer agrees to establish a training program for mechanics and welders. This program shall include ongoing training for current mechanics to cover any and all new or different equipment that is related to the carhaul business and the Employer's operation.

h. In the event an Employer has regularly used driver trainers in its driver training program, such practice will be maintained consistent with the terms contained in the appropriate Area Supplemental Agreement or Local Riders.

i. Effective December 18, 1995, new employees who successfully complete the probationary period shall be assigned a seniority date commencing with their date of hire.

(2) Transferability seniority employees shall be entitled to all of the above rights under the Training Program. However, the employee shall be paid in the same

11

Article 3

manner and amounts as the driver trainee during the training period. Any employee failing to meet the Employer requirement shall have an unqualified right to return to the job and shift left for the Training Program. The Employer shall be obligated for only one (1) opportunity under the transferability clause for any employee.

(3) Retraining Program

a. At any point in the disciplinary process, involving cargo damage, at the employee's option, with Local Union agreement, the driver can be given the opportunity to enter a retraining program in lieu of the discipline. Should the driver elect to enter the retraining program, the driver shall be paid at fifty percent (50%) of the regular hourly rate existing at that time until successful completion of the retraining program, which shall not exceed three (3) days at eight (8) hours per day in duration.

b. In addition, drivers off work longer than six (6) months due to layoff, disability, compensable injury or leave of absence may be required to enter, at the Employer's option, a retraining program to ensure an awareness of the current loading and unloading policies/procedures of the Employer. The driver shall be paid at fifty percent (50%) of the regular hourly rate existing at that time until completion of the retraining program, which shall not exceed three (3) days at eight (8) hours per day in duration.

c. Drivers shall not perform revenue-producing work during the retraining program.

(k) Nothing contained in this Section shall be construed so as to require the Employer to violate any applicable law.

## Section 2.
## Probationary Employees

A probationary employee shall work under the provisions of this Agreement but shall be employed only on a thirty (30)-day trial basis, during which period the employee may be terminated without further recourse; provided, however, that the Employer may not terminate or discipline for the purpose of evading this Agreement or discriminating against Union members. The Union and the Employer may agree to extend the probationary period for no more than thirty (30) days but the probationary employee must agree to such extension in writing. The accrual of seniority for probationary employees shall be determined consistent with Article 3, Section 1(j)(1), if applicable, and provided in the applicable Supplemental Agreement except as it has been otherwise applied by the parties.

**Article 3**

In case of discipline within the thirty (30)-day trial period, the Employer shall notify the Local Union, in writing, of such discipline.

**Section 3.**
**Employment Agency Fees**

If employees are hired through an employment agency, the Employer is to pay the employment agency fee. However, if the Union was given equal opportunity to furnish employees under Article 3, Section 1(c), and if the employee is retained through the probationary period, the fee need not be paid until the thirty-first (31st) day of employment.  Under no circumstances will any employee or applicant be required to pay any employment agency or recruitment fees, training fees or any other fees or costs related to the obtaining and maintaining of employment.

**Section 4.**
**Checkoff**

The Employer agrees to deduct from the pay of all employees covered by this Agreement the dues, initiation fees, legally established credit union and/or uniform assessments of the Local Union having jurisdiction over such employees and agrees to remit to said Local Union all such deductions prior to the end of the month for which the deduction is made. Where laws require written authorization by the employee, the same is to be furnished in the form required.

The Employer will recognize authorization for deduction from wages, if in compliance with state law, to be transmitted to the Union or to such other organizations as the Union may request, if mutually agreed. No such authorization shall be recognized if in violation of state or federal law.

All monies required to be checked off shall become the property of the entities for which it was intended at the time that such checkoff is required to be made. All monies required to be checked off and paid over to other entities under this Agreement shall become the property of those entities for which it was intended at the time that such payment or checkoff is required to be made.

No deduction shall be made which is prohibited by applicable law.

The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his/her paycheck on a weekly basis for all weeks worked. The phrase "weeks worked" excludes any week other than a week in which the employee earned a wage. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one (1)

13

check, the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's social security number and the amount deducted from that employee's paycheck. The International Brotherhood of Teamsters shall reimburse the Employer annually for the Employer's actual cost for the expenses incurred in administering the weekly payroll deduction plan.

In the event that an Employer has been determined to be in violation of this Article by the decision of an appropriate Joint Arbitration Committee, and if such Employer subsequently is in violation thereof after receipt of seventy-two (72) hours' written notice of specific delinquencies, the Local Union may strike to enforce this Article. However, such strike shall be terminated upon the delivery thereof. Errors or inadvertent omissions relating to individual employees shall not constitute a violation.

## Section 5.
## 401(k) Savings Plan

With respect to an Employer that has both a Company 401(k) and Teamsters National 401(k) Plan:

(a) The Employer agrees to offer the Teamster National 401(k) Tax Deferred Savings Plan to employees covered under this contract.  If the Employer has a plan in existence prior to the effective date of the Teamsters National 401(k) Tax Deferred Savings Plan, an employee may participate in either plan.

(b) The Employer shall deduct and remit an amount specified in writing by the employee from the employee paychecks to the Plan designated by the employee.  The Employer shall provide the Administrator of the appropriate 401(k) plan with the name, date of birth, address and date of hire of all newly hired employees within thirty (30) days after the employee acquires seniority and shall provide the Local Union with a copy of such notice.

(c) The NATLD and the Unions shall each designate one Trustee for the jointly-trusteed Teamsters National 401(k) Tax Deferred Savings Plan.  No employer contributions to this plan will ever be required.

## Section 6.
## Retirement Notification

An employee must notify his/her Employer of the filing of an application for his/her normal retirement pension benefit at the time such application is submitted to the applicable pension fund.

## ARTICLE 4.
## STEWARDS

There shall be at least one Steward and one designated alternate at each terminal. The Employer shall provide a locking file cabinet for the Steward to conduct Union business on the Employer's premises.  The Union shall have sole possession of the key.  At no time shall any steward be discriminated against for Union activities. Before discharging a steward, except in cases of proven dishonesty, drunkenness, or being under the influence of a habit forming controlled substance, the Employer shall take the matter up with the Union.

The Employer recognizes the right of the Union to designate a steward and an alternate from the Employer's active work list. The authority of the steward and alternate so designated by the Union shall be limited to, and shall not exceed, the following duties and activities:

(a) The investigation and presentation of grievances with the Employer or the designated Employer representative in accordance with the provisions of the collective bargaining agreement;

(b) The collection of dues when authorized by appropriate Local Union action; and,

(c) The transmission of such messages and information, which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information:

(1) have been reduced to writing; or,

(2) if not reduced to writing, are of a routine nature and do not involve work stoppages, slowdowns, refusal to handle goods, or any other interference with the Employer's business.

(d) The job steward, or his designated alternate, shall be permitted reasonable time-off without pay to attend Union meetings called by the Local Union.  The Employer shall be given twenty-four (24) hours prior notice by the Local Union.

When requested by the Union or the employee, there shall be a Steward or other bargaining unit member designated by the Union present whenever the Employer meets with the employee about grievances or discipline or to conduct investigatory interviews.   Meetings or interviews shall not begin until the Steward or designated bargaining unit member is present.  An employee who does not want a Union Steward or the designated bargaining unit member present at any meeting or interview where

15

the employee has a right to Union representation must waive Union representation in writing.  If a Union requests a copy of waiver, the Employer shall promptly furnish it.

The steward and the alternate have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union.  The Employer recognizes these limitations upon the authority of the steward and the alternate, and shall not hold the Union liable for any unauthorized acts.  The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the steward or designated alternate has taken unauthorized strike action, slowdown or work stoppage in violation of this Agreement.

## ARTICLE 5.
## SENIORITY

### Section 1.
### Definition of Terms

"Company seniority" is a term that is applied to an employee's date of hire by the Employer.

"Terminal seniority" is a term that is applied to the employee's most recent date of employment at a specific terminal.

"Dovetail seniority" is a term that is applied when two (2) or more seniority lists are merged or combined into a single seniority list which recognizes the terminal seniority date of each employee.  The list is arranged by terminal seniority date with the most senior employee at the top.

"Endtail seniority" is a term that is applied when an employee or group of employees are placed at the bottom of a terminal seniority list although they retain their company seniority date for fringe benefits.

"Terminal" is a term that is applied to any facility of an Employer to which employees are assigned to work whether called a branch, terminal, division or operation.

"Fringe Benefits", as used in this Article, is a term that shall apply to vacation accrual only.

**Article 5**

**Section 2.**

Terminal seniority rights for all employees covered by this Agreement shall prevail unless the Supplements or other provisions of this Agreement provide specifically to the contrary. Because of the nature of the transportation industry in which employees transfer during the term of their employment in the industry from one location to another as the flow of business requires, there are two (2) levels of seniority recognized by this Agreement. These levels are known as "company seniority" and "terminal seniority" as defined in Section 1.

The extent to which seniority shall be applied and accrued as well as the methods and procedures of such application shall be clearly set forth, in writing, in this Agreement and in the Supplemental Agreements, including approved Local Riders.

**Section 3.**

(a) Seniority, including for fringe benefits, shall only be broken by discharge, voluntary quit, more than a seven (7)-year layoff, except as otherwise provided herein or for such greater period than seven (7) years as the appropriate Joint Arbitration Committee may direct during the seventh (7th) year. This provision shall be uniformly applied throughout all Supplemental Agreements to the National Master Automobile Transporters Agreement.

(b) Leave of Absence for Union Activities

Employees elected or appointed to full-time Union positions shall maintain and accumulate their seniority with the Employer so long as the employee maintains such full-time position with the Union. Such employee shall be granted a leave of absence without pay and be guaranteed re-employment at the end of such period with the same seniority as though the employee had been continuously employed, provided that the employee is physically qualified to perform the duties which he/she previously performed for the Employer.

**Section 4.**

Seniority lists are dovetailed in the following circumstances:

(a) When the same Employer merges two (2) or more terminals;

(b) When commonly owned separate Employers merge two (2) or more terminals;

17

**Article 5**

(c) When two (2) or more Employers share traffic from the same shipper at the same location and the traffic of one (1) of the Employers is canceled by the shipper and it is assigned to one (1) of the remaining Employers, whether or not there is a financial transaction of any kind involving the affected Employers.  At port facilities, the canceled Employer must have regularly handled the traffic for a period of at least six (6) months for this provision to apply.

(d) When two (2) or more terminals are merged after an Employer enters into a major financial transaction such as a merger, purchase, acquisition, sale or similar transaction with another Employer.  It is immaterial whether the transaction involved merely the purchase of stock of one (1) corporation by another, with two (2) separate corporations continuing in existence.

(e) The above rules shall not apply to the acquisition of a wholly separate and independent company, the operations of which are conducted separately from other operations covered by this Agreement.

## Section 5.

(a) In the event a shipper cancels its business relationship with an Employer at a location and transfers all or part of that business to another Employer which is not servicing that shipper at that location, whether or not there is a financial transaction of any kind involving the affected Employers, both the active and the laid-off employees of the canceled Employer at that terminal shall be placed on a master seniority list.  Those employees who accept employment with the successor employer shall be given a new company seniority date.  This new company seniority date shall be the date used for work opportunities at any of the successor Employer's locations except the employee's original terminal.  However, the employee shall retain his prior company seniority date for fringe benefits.  At port facilities the canceled Employer must have regularly handled the business for a period of more than six (6) months.

(b) Employees of the canceled Employer who remain on layoff after all of the seniority rights contained in Sections 4 and 5(a) have been exercised shall remain on layoff status at their home terminal with recall rights unimpaired.  They shall be afforded additional help opportunities at other locations by both Employers.  For work opportunities at its other locations the successor Employer must exhaust its obligations to its existing laid-off employees before offering opportunities to employees of the canceled Employer.  If an employee accepts employment under this subsection with the successor Employer, a new company seniority date shall be given and there shall be no further obligation of the canceled Employer. However, the employee shall retain his prior company seniority date for fringe benefits.  If the employee selects employment at another location of the canceled Employer, there shall be no further obligation of the successor employer to that employee.

18

**Article 5**

**Section 6.**

Sections 1 through 5 restate, in part, the Agreement and practices developed under Article 5, Section 1 of the 2003-2008 contract and previous contracts.  This restatement is not to be construed as changing retroactively the established seniority lists or other terms and conditions of employment in existing terminals.

**Section 7.**
**New Terminals, etc.**

**(a) Opening of Terminal**

(1) When a new terminal is opened, the Employer shall offer the opportunity to transfer to regular positions in the new terminal in the order of their company or classification seniority, to employees in the terminals which are affected in whole or in part by the opening of the new terminal.

This provision is not intended to apply to replacement of an existing terminal or where a new terminal is opened in a locality where there is an existing terminal.  In these latter situations, laid-off or extra employees in the existing terminal shall have first (1st) opportunity for employment at the new terminal in accordance with their seniority.  If all regular full-time positions are not filled in this manner, then the provisions of the above paragraph shall apply.

(2) The transferred employees, other than those referred to in the exceptions to Section 7(a)(1) above shall, for a period of thirty (30) days following the transfer, have an unqualified right to return to their old terminal if it is still in existence and carry with them their seniority at that old terminal.  Employees who avail themselves of the transfer privileges because they are on layoff at their original terminal may exercise their seniority rights if work becomes available at the original terminal during the seven (7)-year layoff period allowed them at their original terminal. Transferred employees shall have, after thirty (30) days, the same privileges with respect to subsequent transfers as set forth in paragraph (1) above.

(3) Where a new terminal is opened by an Employer which does not affect, in whole or in part, any other terminal of any Employer party to this Agreement, the Employer shall afford all of its drivers an opportunity to transfer to the new operation with full seniority for all purposes.  In the event an employee elects to transfer pursuant to this provision, there shall be no trial period and such transfer is final, except for return rights provided under Section 7(b)(1) of this Article.  In the event the Employer requires additional employees for the new terminal, it shall hire new employees in accordance with Article 3, Section 1(c) of this Agreement.  When new terminals are opened, the drivers who signed the list for the new terminal will be offered work opportunities at that

19

**Article 5**

terminal before any new-hires from the street are added to the seniority list.

**(b) Closing of Terminals**

(1) When a terminal is closed and the work of the terminal is eliminated, an employee who was formerly employed at another terminal shall have the right to transfer back to such former terminal and exercise seniority based on the date of hire at the terminal into which the employee is transferring, provided the employee has not been away from such original terminal for more than three (3) years.

(2) When a terminal is closed or partially closed and the work of the terminal is transferred to another terminal of the same Employer, a sufficient number of employees necessary to perform the transferred work shall have the right to transfer to the terminal into which the work was transferred, if regular work is available. Such employees shall exercise terminal seniority and maintain company seniority for fringe benefit purposes.

(3) The above subsection (b) (2) shall not be applicable in instances when the manufacturer moves a model line from a plant located at one terminal to a plant located at another terminal of the Employer.

(c) In all transfers referred to in subsections (a) and (b) above, the employee must be qualified to perform the job by experience in the classification.  If a driver test is required, such test shall be given by a qualified driver-supervisor or driver.

**Section 8.**

The parties acknowledge that the above rules are intended solely as general standards and further agree that many factual situations may be presented to the Committee which necessitate modification or amendment in the application of these rules to specific factual cases and as set forth in the definition contained in Section 1. Accordingly, the Employers and the Union acknowledge that questions involving the accrual, interpretation or application of seniority rights may arise which require different treatment.  It is understood that the Employers, the Union and the National or Area Joint Arbitration Committees may mutually agree to such disposition of questions of seniority which, in their judgment, is appropriate under the circumstances.  The National and Area Joint Arbitration Committees shall have the authority to determine the establishment and application of seniority in all situations presented to them and the seniority decisions of the Joint Arbitration Committees shall be final and binding on the Employer, the Union and the employees.

**Article 5**

**Section 9.**

Pension and health & welfare contributions paid on behalf of an employee redomiciled as the result of a decision rendered by a Joint Arbitration Committee under the authority of this Article, shall continue to be paid to the appropriate funds to which such contributions were made prior to the employee's change of domicile, and the decisions of the Joint Arbitration Committees shall so specify.  In addition, in the event an employee does voluntarily transfer to another terminal pursuant to the terms of the Additional Help provisions outlined in the Supplemental Agreements, the pension and health & welfare contributions paid on behalf of such employee shall continue to be paid to the appropriate fund that such contributions were made prior to the transfer until the employee relinquishes seniority at the original terminal or nine (9) months whichever is sooner.  This Section shall not apply to any other circumstances wherein employees who voluntarily change domiciles under the provisions of Article 3, Section 1(c) (Additional Employees) or Article 5, Section 7 (New Terminals) herein or who otherwise voluntarily change domiciles under the applicable provisions of the respective Area Supplemental Agreements.  Any disputes concerning the appropriate fund for an Employer's contribution on behalf of a redomiciled employee, pursuant to a Joint Arbitration Committee decision or in event of an Additional Help transfer specified above shall be referred to the National Joint Arbitration Committee.  The decision of the National Joint Arbitration Committee shall, to the extent permitted by law, be final and binding on all affected parties, including the Trust Funds.

**Section 10.**
**Notice of Changes Which Affect Seniority**

When a change is made by an Employer which affects the seniority rights of its employees as provided in this Article, the Employer shall give the affected Local Union(s) reasonable notice in advance of the change.  The Employer and Local Union(s) shall cooperate in assisting the appropriate Area Joint Arbitration Committee or National Committee in determining the seniority of the employees affected in accordance with the terms of this Agreement.  Such determination shall be final and binding on the Employer, the Local Union(s) and the employees.

**Section 11.**

(a) The Employer shall not require employees who exercise rights under Article 5, Section 4, 5, 7, and 8 transfers, except for transfers pursuant to Section 7 (a) (3) new terminal and additional help rights under any Supplement, to purchase any equipment as a condition of continued employment.

**Article 5**

(b) The Employer shall file with the Standing Seniority Committee a request for staffing at any terminal, operating point or other facility at which the Employer has no existing facility and is assigned off rail traffic after June 1, 1999 and retains such traffic for six (6) months.

## Section 12.

The provisions set forth in Sections 1 through 11 above shall be applicable to an employer signatory to an agreement with reciprocal seniority transfer rights.  Any and all matters pertaining to transfer rights, if any, shall be within the exclusive jurisdiction of the National Joint Standing Seniority Committee in accordance with the procedures set forth in Article 7 of this Agreement.

## Section 13.

In the event an Employer is hiring at a location, active employees of the Employer will be permitted to transfer to the hiring location and keep his/her company seniority but will be endtailed on the seniority list after additional help opportunities are exhausted.


## ARTICLE 6.

## Section 1.
## Maintenance of Standards

(a) The Employer agrees, subject to the following provisions, that all conditions of employment relating to wages, hours of work, overtime differentials and general working conditions shall be maintained at not less than the minimum standards in effect at the time of the signing of this Agreement, and the conditions of employment shall be improved whenever specific provisions for improvement are made elsewhere in this Agreement; providing, however, that such past practice shall be limited to those in effect during the term of the immediately expired contract period. It is further agreed that in the event a dispute arises concerning any such past practice, the Local Union must prove that such past practice was in effect.

Oral testimony by an employee claiming a past practice, not accompanied by substantiating proofs or records existing at the time of the alleged past practice, shall not be considered as presumptive proof that such past practice existed.

(b) Individual Employers may, during the life of this Agreement, file with the appropriate Area Joint Arbitration Committee a request for review of those individual standards and conditions claimed or practiced under this Article, which exceed the provisions of this Agreement, Supplemental Agreements and approved Riders. The

**Article 6**

Area Joint Arbitration Committee shall develop a procedure to review the filing including the right to appoint a subcommittee to make recommendations. The Committee shall make every effort to adjust the matter. If the Committee reaches agreement concerning the disposition of the individual standards or conditions, the decision of the Committee shall be final and binding. In the event of deadlock, the submitted conditions shall be referred to the National Joint Arbitration Committee for resolution.

(c) It is agreed that the provisions of this Article shall not apply to inadvertent or bona fide errors made by the Employer or the Local Union in applying the terms and conditions of this Agreement. Such bona fide errors may be corrected at any time.

**Section 2.**
**Extra-contract Agreements**

The Employer agrees not to enter into any agreement or contract with its employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement, except as provided in any Section of this Agreement which provides for economic relief. Any such agreement shall be null and void.

**Section 3.**
**Workweek Reduction**

It is understood and agreed that should it subsequently be determined that any employees come under the provisions of the Fair Labor Standards Act or any similar legislation, or that the maximum workweek is reduced by the Interstate Commerce Commission or Department of Transportation as to such employees, any provisions of this Agreement that do not comply with the requirements of said statutes or regulations are to be changed so that there is no violation of the statutes or regulations. If such changes result in substantial penalties, either to the employees or to the Employers, a written notice shall be sent by either party requesting negotiations to change such provision or provisions as are affected. Thereafter, the National Joint Arbitration Committee shall enter into immediate negotiations for the purpose of arriving at a mutually satisfactory solution. In the event that the National Joint Arbitration Committee cannot agree on a solution to any problem arising from this Section within sixty (60) days after receipt of the stated written notice, either party shall be allowed lawful economic recourse to support their request for revisions.

**Section 4.**

It is mutually agreed that, should the automobile hauling division of the trucking industry, by the truckaway and/or driveaway method, change the nature of its operations by enlarging the commodities hauled or, because of an existing emergency, haul commodities not within the present general operating authority of automobile

23

Article 6

haulers as issued by the Interstate Commerce Commission, then in such case this Agreement may be reopened for consideration only for the purpose of reconsidering the wage scale in the transporting of such new or special commodities not within the purview of permits and certificates in existence at the time of the signing of this Agreement. In the event agreement cannot be reached within sixty (60) days after date such changed operations are put into effect, the matter shall be submitted to the National Joint Arbitration Committee for final disposition. Rates agreed upon or awarded shall be effective as of the date the changed operations were put into effect.


## ARTICLE 7.
## GRIEVANCE MACHINERY

**Section 1.**
**No Strike and/or Lockout**

The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination.

The Unions and the Employers agree that there shall be no strike, tie-up of equipment, slowdown or walkout on the part of the employees, nor shall the Employer use any method of lockout or legal proceeding without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise.

Any disputes the parties are unable to settle shall be referred to the appropriate Automobile Transporters Joint Area Arbitration Committee, except for the following direct violations, which are nondisputable:

    (a) Nonpayment of the established wage rates, when due, provided for in this Agreement, Supplements or Riders;

    (b) Nonpayment of health and welfare contributions as provided for in this Agreement, Supplements or Riders;

    (c) Nonpayment of pension contributions as provided for in this Agreement, Supplements or Riders;

    (d) Noncompliance with Joint Arbitration Committee decisions with respect to Article 3, Section 4;

    (e) This paragraph does not apply to disputes over the computation of wages or application of rates.

Article 7

(f) Modification of any of the terms or provisions of this Agreement, Supplements or Riders, on either a temporary, emergency, interim, permanent or other basis, by any court, administrative agency, or similar body, acting under any bankruptcy law or receivership law, or similar law, including without limitation Section 1113 and any of its subparts.

The Local Union shall give the Employer a seventy-two (72) hour written notice, excluding Saturdays, Sundays and holidays, prior to taking any strike action authorized by this Section. The notice shall specify the reason or reasons for the strike.

## Section 2.
## Work Stoppages

(a) It is mutually agreed that the Local Union will, within two (2) weeks of the date of the signing of this Agreement, serve upon the Employer a written notice listing the Union's authorized representatives who will deal with the Employer, make commitments for the Local Union generally and, in particular, those individuals having the sole authority to act for the Local Union in calling or instituting strikes or any stoppages of work which are not in violation of this Agreement. The Local Union may from time to time amend its listing of authorized representatives by certified mail. The Local Union shall not authorize any work stoppage, slowdown, walkout or cessation of work in violation of this Agreement. It is further agreed that in all cases of an unauthorized strike, slowdown, walkout or any unauthorized cessation of work which is in violation of this Agreement, the Union shall not be liable for damages resulting from such unauthorized acts of its members.

In the event of a work stoppage, slowdown, walkout or cessation of work not permitted by the provisions of Article 7, Section 1, alleged to be in violation of this Agreement, the Employer shall immediately send a telegram or facsimile to the TNATINC Co-Chairperson and the designated Area representative to determine if such strike, slowdown, walkout or cessation of work alleged to be in violation of this Agreement shall be deemed to be authorized unless notification thereof by telegram or facsimile has been received by the Employer and Local Union from the TNATINC Co-Chairperson and the designated Area representative. If no response is received by the Employer within twenty-four (24) hours following actual receipt by the TNATINC Co-Chairperson and the designated Area representative of the Employer's request, excluding Saturdays, Sundays and holidays, such strike, etc., in violation of this Agreement shall be deemed to be unauthorized by TNATINC for the purposes of this Agreement.

In the event of such unauthorized work stoppage or picket line, etc., in violation of this Agreement, the Local Union shall immediately make every effort to persuade the employees to commence the full performance of their duties and shall immediately

25

inform the employees that the work stoppage and/or picket line is unauthorized and in violation of this Agreement. The question of whether employees who refuse to work during such unauthorized work stoppages, in violation of this Agreement, or who fail to cross unauthorized picket lines at their Employer's premises shall be considered as participating in an unauthorized work stoppage in violation of this Agreement, may be submitted to the grievance procedure.

The International Brotherhood of Teamsters, Teamsters National Automobile Transporters Industry Negotiating Committee, Joint Councils and Local Unions shall make immediate efforts to terminate any strike or stoppage of work as aforesaid which is not authorized by such organizations, without assuming liability therefor. For and in consideration of the agreement of the International Brotherhood of Teamsters, Teamsters National Automobile Transporters Industry Negotiating Committee, Joint Councils and Local Unions affiliated with the International Brotherhood of Teamsters to make the aforesaid efforts including the use of all reasonable means at their disposal to require Local Unions and their members to comply with the law or the provisions of this Agreement, including the provisions limiting strikes, work stoppages, as aforesaid, the Association and the Employers who are parties hereto agree that they will not hold the International Brotherhood of Teamsters, Teamsters National Automobile Transporters Industry Negotiating Committee, or Joint Councils liable or sue them in any court or before any administrative tribunal for undertaking such efforts to terminate unauthorized strikes or stoppages of work as aforesaid or for undertaking such efforts to require Local Unions and their members to comply with the law or the provisions of this Agreement. It is further agreed that the signator Association and Employers will not hold the International Brotherhood of Teamsters, Teamsters National Automobile Transporters Industry Negotiating Committee, Joint Councils or Local Unions liable or sue them in any court or before any administrative tribunal for such unauthorized work stoppage alleging condonation, ratification or assumption of liability for undertaking such efforts to terminate strikes or stoppages of work or requiring Local Unions and their members to comply with the law or the provisions of this Agreement, or for taking no further steps to require them to do so.

The provisions of this Article shall continue to apply during that period of time between the expiration of this Agreement and the conclusion of the negotiation or the effective date of the successor Agreement, whichever occurs later. It is understood and agreed that failure by the International Brotherhood of Teamsters, Teamsters National Automobile Transporters Industry Negotiating Committee, and/or the Joint Councils to authorize a strike by a Local Union shall not relieve such Local Union of liability for a strike authorized by it and which is in violation of this Agreement, except as provided in Article 35, Section 5.

(b) The question of whether the International Union, Teamsters National Automobile Transporters Industry Negotiating Committee, Joint Council or Local Union

26

has met their obligation set forth in the immediately preceding paragraph or the question of whether the International Union, Teamsters National Automobile Transporters Industry Negotiating Committee, Joint Council or a Local Union, separately or jointly, participated in an unauthorized work stoppage, slowdown, walkout or cessation of work in violation of this Agreement by calling, encouraging, assisting or aiding in such stoppage, etc., in violation of this Agreement, or the question of whether an authorized strike provided by Article 7, Section 1, is in violation of this Agreement, or whether an Employer engaged in a lockout in violation of this Agreement shall be submitted to the grievance procedure at the National level, prior to the institution of any damage suit action. When requested, the co-chairpersons of the National Joint Arbitration Committee shall immediately appoint a subcommittee to develop a record by collecting evidence and hear testimony, if any, on the sole question of whether the International Union, Teamsters National Automobile Transporters Industry Negotiating Committee, Joint Council or Local Union has met their obligation as aforesaid or of Union participation or Employer lockout in violation of this Agreement. The record shall be immediately forwarded to the National Joint Arbitration Committee for decision. If a decision is not rendered within thirty (30) days after the co-chairpersons have convened the National Committee, the matter shall be considered deadlocked.

A majority decision of the National Joint Arbitration Committee on the questions presented as aforesaid shall be final and binding on all parties. If such majority decision is rendered in favor of one (1) or more of the Union entities, or the Employer, in the case of lockout, no damage suit proceedings on the issues set forth in this Article shall be instituted against such Union entity or such Employer. If, however, the National Joint Arbitration Committee is deadlocked on the issues referred to in this subsection 2(b), either party may institute damage suit proceedings, but the record of the National Joint Arbitration Committee and its subcommittee shall not be offered in evidence by either party for any purpose. Except as provided in this subsection 2(b), agreement to utilize this procedure shall not thereafter in any way limit or constitute a waiver of the right of the Employer or the Union to commence damage suit action. However, the use of evidence in this procedure shall not waive the right of the Employer or the Union to use such evidence in any litigation relating to the strike or lockout, etc., in violation of this Agreement. There shall not be any strike, slowdown, walkout, cessation of work or lockout as a result of a deadlock of the National Joint Arbitration Committee on the questions referred to under this subsection 2(b), and any such activity shall be considered a violation of this Agreement.

(c) In the event that an Employer, party to this Agreement, commences legal proceedings against the Union after the Union's compliance with the provisions of Article 7, Section 2(a), the Employer Association will cooperate in presenting to the court the applicable majority grievance committee decision or grievance deadlocked by the National Committee.

**Article 7**

(d) Nothing herein shall prevent the Employer or the Union from securing remedies granted by law except as specifically set forth in subsection 2(b).

**Section 3.**
**Designation of Representatives**

The Employer and Local Union must designate its representatives at each facility who are authorized to settle grievances on the local level and must so notify each party within one (1) week of the consummation of this Agreement. In the event the authorized representatives of the Employer or the Local Union change during the life of this Agreement, the Employer shall notify the Union or the Union shall notify the Employer, as the case may be, within one (1) week of such change.

**Section 4.**
**Grievance Procedure**

The following procedure shall be used in processing all grievances. This Section contains a special provision for processing alleged pay shortages and violations of the dispatch procedure. There are separate provisions in the Supplemental Agreements for processing grievances involving suspensions or discharges.

The provisions of subpart (b) below shall not be applicable at any terminals covered by the Western Area Supplemental Agreement. The provisions of subpart (b) below shall not be applicable at a terminal covered by the Central-Southern Supplemental Agreement unless the Employer and the Local Union agree in writing to make it applicable.

**Step 1.**

(a) All grievances shall first be taken up and discussed by the employee and the Employer.

(b) Claims Involving Pay Shortages and Violations of Dispatch Procedure

Any employee who claims any pay shortage, including a claimed violation of the dispatch procedure, shall file a request for a wage review with the Employer. This request must be filed in writing within ten (10) days excluding Saturdays, Sundays and holidays after receipt of the paycheck by the employee. Multiple copies of a request for wage review in a form set forth below shall be made available by the Employer for that purpose. The Employer shall meet with the employee to discuss the claim as soon as possible but no later than ten (10) days following receipt of such request excluding Saturdays, Sundays and holidays at which time the Employer shall make a written reply to the claim. If the claim is not adjusted satisfactorily, and if the employee wishes to file

28

**Article 7**

a written grievance, such grievance shall be filed within ten (10) days excluding Saturdays, Sundays and holidays after the written denial of the claim.  These time limits replace other time limits expressed in this Agreement and are firm.  Failure to file or respond on time will result in a default against the party failing to comply.  Defaults establish no precedent on the merits of the claim.

After any grievance is reduced to writing, the Employer representative will make available for inspection by the business agent and/or the steward, time sheets and all such other records as are pertinent to the handling of the specific dispute or grievance.  This does not preclude or prevent an oral attempt on the part of the business agent or the steward to settle such dispute or grievance before a request is made for such records.  If the grievance is not settled it shall be referred to Step 4.

REQUEST FOR WAGE REVIEW

Date Submitted_____

The undersigned requests that the Employer review my earnings for the pay period _____ (date)

Check No. _____ because:  (give a short statement of the claim).

The undersigned requests a meeting to discuss this claim.

_____
Name of Employee

EMPLOYER ANSWER  (Within 10 days excluding Saturdays, Sundays and holidays)

Date of Response _____

Meeting held with employee _____
(date) _____

_____
Name of Employer Representative

**Step 2.**

If no settlement is reached in Step 1, the grievance will be taken up and discussed by the steward or the business agent of the Local Union involved and the Employer.

**Article 7**

**Step 3.**

If no settlement is reached in Step 2, the grievance shall be put in writing and presented to the Employer no later than thirty (30) days after the dispute or grievance arises, except as may be otherwise provided in a Supplemental Agreement or Section 4 of this Article.  The Employer must reply to the written grievance in writing to the Local Union within fourteen (14) days after receipt of the written grievance.

After any grievance is reduced to writing, the Employer representative will make available for inspection by the business agent and/or steward, time sheets and all such other records as are pertinent to the handling of the specific dispute or grievance. This does not preclude or prevent an oral attempt on the part of the business agent or the steward to settle such dispute or grievance before a request is made for such records.

**Step 4.**

The Local Union and the Employer shall conduct a local-level hearing after the foregoing steps have been exhausted.  Scheduling of the local-level hearing will be by mutual agreement but it is to take place as soon as possible but no later than thirty (30) days after the Employer's written response to the grievance to discuss and attempt to resolve the grievance.  If the grievance is not resolved at the local-level hearing, either party has the right to file the grievance with the appropriate Joint Arbitration Committee within fifteen (15) days after the local-level hearing.

During the local-level hearing and prior to docketing the grievance with the Joint Arbitration Committee, the business agent and Employer representative shall designate in writing that the grievance has been examined by both parties.  This document must be attached to the grievance if it is filed with the Joint Arbitration Committee.  Failure of the Local Union and the Employer to comply with this requirement shall preclude the docketing of the grievance and it shall be returned to the parties to comply with this requirement.

Any party to a grievance who intends to use a decision of any Joint Arbitration Committee as precedent must present a copy of the decision to the other party as soon as possible prior to the presentation of the case to the Committee.

**Article 7**

**Section 5.**
**Designation of Joint Arbitration Committees**

(a) National Automobile Transporters Joint Arbitration Committee

The Employers and the Unions from each of the designated Areas shall establish the National Automobile Transporters Joint Arbitration Committee, hereinafter referred to as the National Joint Arbitration Committee. This Committee shall consist of designated representatives of the Employers and Local Unions who are parties of this Agreement. Any panel of the National Joint Arbitration Committee hearing a case shall consist of an equal number of designated representatives of the Employers and the Local Unions.

(b) Area Joint Arbitration Committees

The Employers and the Local Unions in the appropriate Areas referred to in Article 1, Section 1, shall establish Area Joint Arbitration Committees designated as:

(1) Central Joint Committee;

(2) Southern Joint Committee;

(3) Eastern Area Automobile Transporters Joint Arbitration Committee;

(4) Western Area Automobile Transporters Joint Arbitration Committee.

The Area Joint Arbitration Committees shall consist of designated representatives of the Employers and the Local Unions from the appropriate area(s). Any panel of the Area Joint Arbitration Committee hearing a case shall consist of an equal number of designated representatives of the Employers and the Local Unions.

(c) Multi-State or Area Joint Arbitration Committees, within Western Area.

The following Multi-State or Area Joint Arbitration Committees are recognized and designated to function as Joint Arbitration Committees.

Western Area:

Southwest Local Committee
Northwest Local Committee

The Employers and the Local Unions may agree upon changes to the number of and the geographical locations of the above Joint Arbitration Committees to function hereunder subject to National Joint Arbitration Committee approval.

31

**Article 7**

Each committee shall consist of designated representatives appointed by the Employers and the Local Unions from the affected geographical area.  Any panel of the Multi-State or Area Joint Arbitration Committee hearing a case shall consist of an equal number of designated representatives of the Employers and the Local Unions.  Each member may appoint an alternate.

**Section 6.**
**Rules of Procedure**

All Joint Arbitration Committees shall formulate rules of procedure to govern the conduct of their proceedings.  Upon adoption, all Multi-State Joint Arbitration Committees shall submit their rules to the appropriate Area Joint Arbitration Committee for review and approval.  In the event a Multi-State Joint Arbitration Committee fails to agree upon its rules of procedure, it shall refer the disputed items to the appropriate Area Joint Arbitration Committee which shall resolve the disputed items and formulate rules of procedure for adoption by the Multi-State Joint Arbitration Committee.  Rules of procedure for Joint Arbitration Committees may not be in conflict with similar provisions of the Rules of Procedure for the National Automobile Transporters Joint Arbitration Committee. If any conflict exists, the provisions of the National Committee Rules of Procedure shall prevail.

**Section 7.**
**Functions of Joint Arbitration Committees**

     **(a) National Joint Arbitration Committee**

It shall be the function of the National Joint Arbitration Committee to settle disputes and grievances which arise under the following circumstances:

     (1) Involving interpretations of, or disputes over, the provisions of the National Master Automobile Transporters Agreement;

     (2) Disputes and grievances the determination of which affect an Employer and/or Union operating in two (2) or more of the designated Areas if more than one (1) area is affected by the issue;

     (3) Disputes and/or grievances which are deadlocked or referred by any of the four (4) Joint Area Arbitration Committees referred to above;

     (4) Disputes and interpretations concerning alleged conflicts in provisions of the National Master Agreement on the one hand and Area Supplements and Riders thereto on the other hand.

**Article 7**

(5) Claims that a decision issued by any area or multi-state Joint Arbitration Committee are contrary to the provisions of Articles 1 through 35 of the NMATA may be submitted to either the Union or Employer Chairperson of the National Joint Arbitration Committee, and must be submitted within fifteen (15) calendar days of the date of the decision being appealed.  The National Joint Arbitration Committee may reverse or modify any such decision that either the Union or Employer Chairperson determines to submit to it.  If the National Joint Arbitration Committee fails to reach a majority decision to modify or reverse such a lower level decision, the decision shall stand as final and binding, and will not be considered deadlocked or referred to a Board of Arbitration.

### (b) Area Joint Arbitration Committee

It shall be the function of the Area Joint Arbitration Committees to settle disputes and grievances deadlocked or referred to it by the appropriate Multi-State Joint Arbitration Committee or directly filed by a party consistent with this Agreement which grievance was not settled in accordance with Section 5 of this Article.

### (c) Multi-State Joint Arbitration Committees

It shall be the function of the various Multi-State Joint Arbitration Committees to settle disputes which have not been settled by the Employer and the Local Union in accordance with Section 5 and the procedure therein established.

**Section 8.**
**Rights of National, Area and Multi-State Joint Arbitration Committees**

(a) The Joint Arbitration Committees designated in this Article shall have the right to investigate all facts pertaining to the dispute.  Both parties shall be entitled to present such evidence and witnesses in support of their position as they see fit.

A decision by a majority of a Joint Arbitration Committee shall be final and binding on the Employer, the Local Union and the employees.

(b) The Joint Arbitration Committees shall have the authority to order full, partial or no compensation in deciding disputes and/or grievances and rendering awards.

(c) It is agreed that all matters pertaining to the interpretation of any provision of this National Agreement, whether requested by the Employer or the Local Union, must be submitted to the National Automobile Transporters Joint Arbitration Committee for decision.

(d) It is agreed that all matters pertaining to the interpretation of any provision of an Area Supplement or Local Rider thereto, whether requested by the Employer or the Local Union, must be submitted to the appropriate Area Joint Arbitration Committee for decision.

(e) Any decision of any of the Joint Arbitration Committees shall be final and binding upon the Employer, the Local Union, and the employees.

(f) All Multi-State, Area and National Joint Arbitration Committees designated in this Agreement shall have the jurisdiction and power to decide grievances or disputes which arose under this Agreement, its Supplements and Local Riders, applying, however, the contract under which the grievance arose.

## Section 9.
## Board of Arbitration

(a) If any grievance or dispute is deadlocked by the National Joint Arbitration Committee, as provided above, the Committee shall submit the grievance to a Board of Arbitration consisting of three (3) members:

(1) The Union Co-Chairperson or a member appointed by same;

(2) The Employer Co-Chairperson or a member appointed by same;

(3) The two (2) Co-Chairpersons together selecting a third (3rd) disinterested arbitrator from any of the eight (8) neutral arbitrators on the list described in (b).

(b) Within thirty (30) days of the ratification of this Agreement the Co-Chairpersons of the National Negotiating Committee shall jointly select eight (8) individuals to serve as neutral arbitrators. The list of arbitrators shall be chosen from the members of the National Academy of Arbitrators (NAA) or the American Arbitration Association (AAA). These eight (8) individuals shall constitute the exclusive list of neutral arbitrators until June 1, 2009, at which time either National Negotiating Committee Co-Chairperson, after giving thirty (30) days written notice to the other Co-Chairperson, may delete one or more of the neutral arbitrators from the list. Similarly, either Co-Chairperson may remove a neutral arbitrator(s) on June 1, of each year thereafter. No other changes may be made concerning the list, except in the event of the resignation, death or disability of a neutral arbitrator. If a vacancy occurs on the list, the Co-Chairpersons shall jointly select a successor within thirty (30) days after the vacancy occurs.

**Article 7**

(c)        (1) The three (3) member Board of Arbitration must be named within five (5) days before the regularly scheduled meeting of the National Joint Arbitration Committee. The three (3) member Board of Arbitration shall meet on a quarterly basis and shall hear all deadlocks submitted to it by the National Joint Arbitration Committee at its previously scheduled regular meeting.  The neutral member of this Board of Arbitration shall be rotated at each quarterly meeting among the eight (8) members designated in (b) above. The identity of the Board shall be submitted in writing to the affected Local Union(s) and Employer(s) five (5) days in advance of the scheduled meeting of the Board of Arbitration.

(2) The Board of Arbitration shall convene two (2) weeks following the regularly scheduled meetings of the National Joint Arbitration Committee.

(3) None of the above time limits are subject to change except by mutual written agreement of the involved Local Union and Employer.

(d) At the hearing before the Board of Arbitration, the Employer's case shall be presented by a full-time employee of the Employer and the Union's case by a full-time employee of the Local Union, except for Work Preservation Agreement cases.  An official record shall be maintained at the Board of Arbitration hearing.

(e) It is agreed that the majority of the Board of Arbitration is empowered to hear and decide the deadlocked case, even if only one (1) of the parties submits to arbitration, or if either party fails to appear at the hearing or to present evidence. The Board of Arbitration shall have the authority to interpret and apply the provisions of this Agreement or Supplements thereto, where appropriate, but shall not have the authority to amend or modify this Agreement or Supplements thereto, or establish new terms and conditions under this Agreement or Supplements thereto.

(f) The Board of Arbitration shall issue a bench decision at the conclusion of the hearing involving each case; provided, however, the Board of Arbitration may ask the parties to submit briefs or delay its decision in the event of any case deemed sufficiently complex.  The Board of Arbitration must render its decision no later than thirty (30) days after the conclusion of the Board of Arbitration hearing.

The decision to require briefs or to delay the decision shall be solely that of the Board of Arbitration.

(g) The findings and decision of a majority of the Board of Arbitration shall be final and binding on the parties and the employees involved.

(h) The cost of the neutral arbitrator as well as the expenses of the Board of Arbitration meeting shall be shared equally by the Local Unions and the Employers involved in the Board of Arbitration hearing to which their respective cases have been

submitted.  In the event, however, there are cancellation fees submitted by the neutral arbitrator because no cases were submitted at the regularly scheduled Board of Arbitration hearing, the NATLD and TNATINC shall equally share the cancellation fees under these circumstances.

## Section 10.

Failure of either party involved in a grievance or dispute to comply with any grievance settlement that has been reduced to writing, a final decision of a panel of any Joint Arbitration Committee or a Board of Arbitration established under this Article within ten (10) working days of the date of the decision or settlement shall give the other party the immediate right to all legal and economic recourse in support of such decision.  In the case of non-monetary settlements, disputes over non-compliance will first be sent to the Co-Chairmen of the National Joint Arbitration Committee for resolution. In the event the Co-Chairmen are unable to agree on the resolution, the Union will then have the right to strike in accordance with this Section.  An Employer or Union challenging a decision issued by a Board of Arbitration in the above manner shall pay the other party the cost of such challenge, including the court costs and reasonable attorneys fees if the Court does not modify or vacate the Board of Arbitration's decision.

The provisions of Article 7, Section 1, first and second paragraphs and the provisions of Article 7, Section 13 shall not apply to recourse taken by any party under the terms of this Section.

## Section 11.

Jurisdiction of all Joint Arbitration Committees may be invoked only by authorized union representatives or by the Employer. Authorized union representatives may file grievances alleging violation of this Agreement under local grievance procedure.

## Section 12.

Time limitations regarding the filing of grievances, if not set forth in this Agreement or the respective Supplemental Agreements, must appear in the Rules of Procedure of Joint Arbitration Committees and shall apply equally to the parties.  These time limitations may be extended only by mutual agreement.

## Section 13.

Unless otherwise expressly provided in this Agreement, any and all disputes, including interpretations of contract provisions arising under, out of, in connection with, or in relation to this collective bargaining agreement, shall be subject to the grievance procedure of this Agreement.

**Article 7**

**Section 14.**

All meetings of Joint Arbitration Committees referred to in this Article must be attended by each member of the Committee or an alternate.

**Section 15.**

Claims made by Employers for overpayment of wages and claims made by employees for underpayment of wages, when upheld by an appropriate Joint Arbitration Committee, shall be limited to sixty (60) days prior to the date the claim was filed.

**Section 16.**
**Financing**

The Multi-State, Area or National Joint Committees must provide a method for financing the costs directly arising from administration of the Joint Committees and set forth these provisions in their respective Rules of Procedure.

**Section 17.**
**Standing Seniority Committee**

(a) The Local Union and Employer agree that all issues arising under or grievances alleging violations of Article 5, Sections 4, 5, 7 and 8 shall be submitted to a Standing Seniority Committee.

(b) The members of the Standing Seniority Committee shall consist of an equal number of Local Union and Company representatives who shall be appointed within sixty (60) days of ratification of the agreement by the National Joint Committee Co-Chairpersons.  They shall serve through the duration of the contractual agreement.

(c) The specific panel members of the Standing Seniority Committee shall be appointed by the National Co-Chairpersons in advance of any hearing.  No member of the Standing Seniority Committee panel shall be directly involved in the seniority dispute or grievances pending before the Standing Seniority Committee.

(d) The Standing Seniority Committee shall convene regularly in conjunction with the scheduled meetings of the National Joint Committee and at other times the Co-Chairpersons may designate.

(e) The Standing Seniority Committee Rules of Procedure shall be promulgated by the National Joint Committee and shall be incorporated in that Committee's Rules of Procedure.  The Rules shall include a requirement that each party furnish the Standing

37

**Article 7**

Seniority Committee in advance of the hearing relevant documents including, without limitation, all involved seniority lists, prior Joint Committee or Board of Arbitration Awards which have affected the composition of the existing seniority lists, projected dates or effective dates of the events leading to the seniority issues involved and all other relevant information.

(f) These procedures shall not apply to grievances arising under the additional help provisions contained in the applicable supplemental agreements or individual grievances filed by employees protesting their relative ranking on a seniority list. These disputes shall be resolved in accordance with the remaining provisions of Article 7 of this Agreement.

**Section 18.**
**Grievant's Bill of Rights**

All employees who file grievances under the Agreement and its Supplemental Agreements are entitled to have their cases decided fairly and promptly. In order to satisfy these objectives and promote confidence in the integrity of the grievance procedures, all employees who file grievances are entitled to the following rights:

1. Grievants and Stewards shall be informed by their Local Union of the time and place of the hearing.

2. Grievants and Stewards are permitted to attend, at their own expense, the hearing in cases in which they are involved, unless otherwise agreed to by the Employer and Local Union.

3. The Employer shall provide any pertinent and relevant information identified with reasonable specificity within fifteen (15) days of receipt of a written request by the Local Union, Steward or grievant.

4. All cases involving seniority or a discharge shall be recorded, except for executive sessions. Transcriptions of these proceedings shall be prepared in response to written requests by the Local Union at the reasonable cost of transcription, which shall be borne by the employee or party making the request.

5. A grievant or Steward may request permission to present argument in support of the case in addition to the evidence or argument presented by the Local Union.

6. All Joint Committees shall provide written decisions describing the reasons relied upon in reaching the decision, and upon request of the Employer or the Local Union, copies shall be provided during the course of the Joint Committee meeting that the case is decided.

**Article 7**

7. Cases may be postponed only by mutual agreement between the Local Union and Employer.

8. A copy of the Joint Committee Rules of Procedure, including the Grievant's Bill of Rights, shall be provided by the Joint Committee upon request of the grievant prior to the commencement of the Joint Committee hearing.

**Section 19.**

All Multi-State and Area Grievance Committees established under Supplemental Agreements shall revise their Rules of Procedure to include the "Grievant's Bill of Rights" set forth in Section 18 above and shall submit their revised Rules of Procedure to the National Joint Arbitration Committee for approval no more than ninety (90) days after the effective date of this Agreement.  The National Joint Arbitration Committee may revise, delete, or add to the Rules of Procedure for a lower level Joint Arbitration Committee in any manner necessary to ensure conformity with the purposes and objectives of the Grievant's Bill of Rights.  The decisions of the National Joint Arbitration Committee in this regard shall be final and binding.

**Section 20.**

An employee who is discharged or suspended shall remain on the job until the discharge or suspension is sustained under the grievance procedure, except in cases involving the cardinal infractions as defined in the applicable Area Supplement as any offense for which an employee is subject to discharge without a prior warning notice.

**Section 21.**

All monetary grievances that have been resolved either by decision or through settlement shall be paid within fourteen (14) calendar days of formal notification of the decision or date of settlement.  If an Employer fails to pay a monetary grievance in accordance with this section, the Employer shall pay as liquidated damages to each affected grievant eight (8) hours straight time pay for each day the Employer delays payment.

## ARTICLE 8.
## PROTECTION OF RIGHTS

**Section 1.**
**Picket Line**

It shall not be a violation of this Agreement, and it shall not be cause for discharge, disciplinary action or permanent replacement, in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work beyond any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's place of business.

**Section 2.**
**Struck Goods**

It shall not be a violation of this Agreement and it shall not be cause for discharge, disciplinary action or permanent replacement, if any employee refuses to perform any service which the Employer undertakes to perform as an ally of an Employer or person whose employees are on strike, and which service, but for such strikes, would be performed by the employees of the Employer or person on strike.

**Section 3.**

Subject to Article 33 - Work Preservation, or the appropriate work preservation or subcontracting provisions of the Area Supplements, the Employer agrees that it will not cease or refrain from handling, using, transporting or otherwise dealing in any of the products of any other Employer or cease doing business with any other person, or fail in any obligation imposed by the Motor Carriers' Act or other applicable law, as a result of individual employees exercising their rights under this Agreement or under law, but the Employer shall, notwithstanding any other provision in this Agreement, when necessary continue doing such business by other employees.

**Section 4.**

The layover provisions of the applicable Supplemental Agreement shall apply when the Employer knowingly dispatches a road driver to a terminal or dealer at which a primary picket line has been posted as a result of the exhaustion of the grievance procedure, or after proper notification of a picket line permitted by the collective bargaining agreement, or economic strikes occurring after the expiration of a collective bargaining agreement or to achieve a collective bargaining agreement.

Article 8

**Section 5.**
**Grievances**

Within five (5) working days of filing a grievance claiming violation of this Article, the grievance shall be submitted directly to the National Joint Arbitration Committee without taking any intermediate steps, any other provision of this Agreement to the contrary notwithstanding.

## ARTICLE 9.
## BONDS

Should the Employer require any employee to give bond, cash bond shall not be compulsory, and any premium involved shall be paid by the Employer. The primary obligation to procure the bond shall be on the Employer. If the Employer cannot arrange for a bond within ninety (90) days, the Employer must so notify the employee in writing. Failure to so notify shall relieve the employee of the bonding requirement. If proper notice is given, the employee shall be allowed thirty (30) days from the date of such notice to make personal bonding arrangements, standard premiums only on said bond to be paid by the Employer. A standard premium shall be that premium paid by the Employer for bonds applicable to all other of its employees in similar classifications. Any excess premium is to be paid by the employee. Cancellation of a bond after once issued shall not be cause for discharge, unless the bond is canceled for cause which occurs during working hours or due to the employee having given a fraudulent statement in obtaining said bond.

## ARTICLE 10.
## COMPENSATION CLAIMS AND PAID LEAVE

**Section 1.**
**Compensation Claims**

At the time an injury report is turned in, the Employer shall provide the injured employee with an information sheet briefly outlining the procedure for submitting a worker's compensation claim to include the name, address and phone number of the Employer's worker's compensation representative and other pertinent information relative to the claim.

No employees will be disciplined or threatened with discipline as a result of filing an on-the-job injury report.  The Employer or its designee shall not visit an injured employee at their home, at a hospital, or any location outside the employee's home terminal without the employee's or his/her designee's prior written consent.

41

**Article 10**

**Section 2.**
**Day of Injury**

    (a) An employee who is injured on the job and is sent home or to a hospital, or who must obtain medical attention, shall receive pay at the applicable hourly rate for the balance of the employee's regular shift on that day. An employee who has returned to regular duties after sustaining a compensable injury, and who is required by the workers' compensation doctor to receive additional medical treatment during regularly scheduled working hours, shall receive the regular hourly rate of pay for such time.

    (b) In the event that an employee sustains an occupational illness or injury while on a run away from the home terminal, the Employer shall provide transportation by bus, train, plane or automobile to the home terminal if and when directed by a doctor. The Employer agrees to provide any employee injured locally appropriate transportation, including an ambulance when the nature of the injury so warrants, at the time of injury from the job to the medical facility and return to the job, or to the employee's home locally if required.

    (c) The employee must by the end of the shift or in the case of a driver who is on a trip, upon return to the home terminal or prior to the next dispatch if appropriate personnel are not available on the return, notify the Employer of an injury sustained and complete the required forms.

**Section 3.**
**Modified Work**

    (a) The Employer may establish a modified work program designed to provide temporary opportunity to those employees who are unable to perform their normal work assignments due to a disabling on-the-job injury. Recognizing that a transitional return-to-work program offering both physical and mental therapeutic benefits will accelerate the rehabilitative process of an injured employee, modified work programs are intended to enhance worker's compensation benefits and are not to be utilized as a method to take advantage of an employee who has sustained an industrial injury.

    (b) When implemented, modified work programs shall be in strict compliance with applicable federal and state worker's compensation statutes. When offered to qualified employees, as defined in this Article, modified work must be accepted, and refusal to accept modified work by an employee, otherwise entitled to worker's compensation benefits, may result in a loss or reduction of such benefits as specifically provided by the provisions of applicable federal or state worker's compensation statutes. Employees who accept modified work shall continue to be eligible to receive "temporary partial" worker's compensation benefits as well as all other entitlements as provided by applicable federal or state worker's compensation statutes.

(c) At facilities where the Employer has a modified work program in place, temporary modified assignments shall be offered in seniority order to those regular full time employees who are temporarily disabled due to a compensable worker's compensation injury and who have received a detailed medical release from the attending physician clearly setting forth the limitations under which the employee may perform such modified assignments.  Once a modified work assignment is made and another person is injured, the second person must wait until a modified work opening occurs, regardless of seniority.  All modified work assignments must be made in strict compliance with the physical restrictions as outlined by the attending physician.  All modified work program candidates must be released for eight (8) hours per day, five (5) days per week.  The Employer, at its option, may make a modified work offer of less than eight (8) hours per day where such work is expected to accelerate the rehabilitative process and the attending physician recommends that the employee works back to regular status or up to eight (8) hours per day by progressively increasing daily hours. A copy of any release for modified work must be given to the employee before the modified work assignment begins.

It is understood and agreed those employees who, consistent with professional medical evaluations and opinion, may never be expected to receive an unrestricted medical release, shall not be eligible to participate in a modified work program.

In the event of a dispute related to conflicting medical opinion, such dispute shall be resolved pursuant to established worker's compensation law and/or the method of resolving such matters as outlined in the applicable Supplemental Agreement.  In the absence of a provision in the Supplemental Agreement, the following shall apply:

When there is a dispute between two (2) physicians concerning the release of an employee for modified work, such two (2) physicians shall immediately select a third (3rd) neutral physician within seven (7) days, whose opinion shall be final and binding on the Employer, the Union and the employee.  The expense of the third (3rd) physician shall be equally divided between the Employer and the Union.  Disputes concerning the selection of the neutral physician or back wages shall be subject to the grievance procedure.

For locations where the Employer intends to implement a modified work program or has a modified work program in place, the Local Union shall be provided with a copy of the current form(s) being used for employee evaluation for release and general job descriptions.  This information shall be general in nature, not employee specific.

When a modified work assignment is made, the employee shall be provided with the hours and days he/she is scheduled to work as well as the nature of the work to be performed in writing.  A copy of this notice shall also be submitted to the Local Union.

(d) Modified work shall be restricted to the type of work that is not expected to result in a re-injury and which can be performed within the medical limitations set forth by the attending physician.  In the event the employee is physically unable to perform the modified work assigned, he/she shall be either reassigned modified work within his/her physical capabilities or returned to full "temporary total" worker's compensation benefits.  In the event a third (3rd) party insurance carrier refuses to reinstate such employee to full temporary total disability benefits, the Employer shall be required to pay the difference between the amount of the benefit paid by such third (3rd) party insurer and full total temporary disability benefits. Determination of physical capabilities shall be based on the attending physician's medical evaluation.  Under no conditions will the injured employee be required to perform work at that location subject to the terms and conditions of the National Master Automobile Transporters Agreement or its Area Supplemental Agreements.  Prior to acceptance of modified work, the affected employee shall be furnished a written job description of the type of work to be performed.

(e) The modified workday and workweek shall be established by the Employer within the limitations set forth by the attending physician.  However, the workday shall not exceed eight (8) hours, inclusive of coffee breaks where applicable and exclusive of a one-half (1/2) hour meal period and the workweek shall not exceed forty (40) hours, Monday through Friday, or Tuesday through Saturday, unless the nature of the modified work assignment requires a scheduled workweek to include Sunday. Whenever possible, the Employer will schedule modified work during daylight hours, Monday through Friday, or during the same general working hours and on the same workweek that the employee enjoyed before he/she became injured.  In the case of an employee whose workdays and/or hours routinely varied, the Employer will schedule the employee based on the availability of the modified assignment being offered.  Any alleged abuse of the assignment of workdays and work hours shall be subject to the grievance procedure.

(f) Modified work time shall be considered as time worked when necessary to satisfy vacation and sick leave eligibility requirements as set forth in the National Master Automobile Transporters Agreement and/or its applicable Area Supplemental Agreements.  In addition to earned vacation pay as set forth in the applicable Area Supplemental Agreements, employees accepting modified work shall receive prorated vacation pay for modified work performed based on the weekly average modified work pay.  The only time modified work is used in prorating vacation is when the employee did not qualify under the applicable Supplemental Agreement.

Holiday pay shall first be paid in accordance with the provisions of the applicable Supplemental Agreement as it relates to on-the-job injuries.  Once such contractual provisions have been satisfied, holidays will be paid at the modified work rate which is the modified work wage plus the temporary partial disability benefit.

Sick and funeral leave taken while an employee is performing modified work will be paid at the modified work rate, which is the modified work wage plus the temporary partial disability benefit.  Unused sick leave will be paid at the applicable contract rate where the employee performed modified work and qualified for the sick leave during the contract year.

(g) The Employer shall continue to remit contributions to the appropriate health & welfare and pension trusts during the entire time period employees are performing modified work.  Continuation of such contributions beyond the period of time specified in the Supplemental Agreement for on-the-job injury shall be required.  Provisions of this Section shall not be utilized as a reason to disqualify or remove an employee from the modified work program.

(h) Employees accepting modified work shall receive temporary partial benefits as determined by each respective state workers' compensation law, plus a modified work wage when added to such temporary partial benefit, shall equal not less than eighty-five percent (85%) of forty (40) hours pay he/she would otherwise be entitled to under the provisions of the applicable Area Supplemental Agreement for the first six (6) months from the date the modified work assignment commences.  After this initial six (6) month period, the percentage shall increase to ninety percent (90%) for the duration of each individual modified work assignment.  The Employer shall not refuse to assign modified work to employees based solely on such employees reaching the ninety percent (90%) wage level.  Such refusal shall be considered an abuse of the program and shall be subject to the grievance procedure.  Modified work assignments beginning or ending within a workweek shall be paid on a prorated basis; one (1) day equals one-fifth (1/5th).

(i) Employees accepting modified work shall not be subject to disciplinary action provisions of the Supplemental Agreements unless such violation involves an offense for which no prior warning notice is required under the applicable Supplemental Agreement (Cardinal Sins).  Additionally, the provisions of Article 30, Section 14 shall apply.

(j) Alleged abuses of the modified work program by the Employer shall be subject to the grievance procedure of the National Master Automobile Transporters Agreement and its applicable Area Supplemental Agreements.  Proven abuses may result in a determination by the National Joint Arbitration Committee that would withdraw the benefits of this Article from that Employer, in whole or in part, in which case affected employees shall immediately revert to full worker's compensation benefits.

**Article 10**

**Section 4.**
**Funeral Pay**

In the event of a death in the family (father, mother, wife, husband, brother, sister, son or daughter, including foster parents and step-parents, grandparents, grandchildren, mother-in-law, father-in-law, step-children and foster children), a regular employee shall be entitled to three (3) days' pay.

A regular employee shall be entitled to three (3) days' funeral leave during the period from and including the day of the death of the designated relative to and including the day after the funeral if all other conditions set forth herein are met:

 (a) To be eligible for paid funeral leave, the employee must attend, or make a bona fide effort to attend the funeral or memorial service.

 (b) Pay for compensable funeral leave shall be for eight (8) hours at the straight-time hourly rate for each day of funeral leave for which the employee is eligible.

 (c) Funeral leave is not compensable when the employee is on leave of absence, vacation, bona fide layoff, sick leave, holiday, workers' compensation, jury duty or would not have otherwise worked.

 (d) The relatives designated shall include brothers and sisters having one (1) parent in common; and those relationships generally called "step," providing persons in such relationship have lived or have been raised in the family home and have continued an active family relationship.

 (e) Those Supplemental Agreements having pre-existing funeral leave clauses shall retain the same, unless amended by Supplemental negotiations.

**Section 5.**
**Sick Leave**

 (a) This Agreement shall provide for five (5) days of sick leave per contract year unless otherwise modified in the Supplemental Agreement.

Employees must be listed on the seniority roster (active or inactive) at the commencement of each contract year (June 1) and have remained continuously on such seniority roster at the time sick leave payments are claimed.

 (b) In order to be eligible for daily sick leave payments, the eligible employee must be on the active seniority roster at the time of illness or accident.

46

**Article 10**

Sick pay will be paid on the day that an employee notifies the Employer of an illness or injury. However, the first day sick pay will not be paid if the first day of absence is the day immediately preceding or following a paid holiday or scheduled vacation, in which case the employee must be absent three (3) consecutive days and sick pay will then be paid retroactive to the first day of absence.

(c) Truckaway or driveaway drivers with bid schedules shall be treated as local employees with a standard workweek. Line drivers on sleepers or rotating boards will be treated as having a seven (7) day operation with no off days for the purpose of computing qualifying workdays.

(d) Sick leave does not establish the need for a doctor's statement before sick leave benefits are paid. However, sick leave shall not interfere with an established procedure that requires an employee to have a doctor's statement before returning to work.

(e) Employees on the inactive seniority roster prior to June 1 of a calendar year due to layoff or long term illness or injury are not eligible to receive sick leave. Once the employee returns to work, he shall be eligible for sick leave occurring after that date.

(f) Sick leave not used by May 31st of any contract year will be paid on May 31st at the applicable hourly rate in existence on that date. Each day of sick leave will be paid for on the basis of eight (8) hours' straight-time pay at the applicable hourly rate. Sick leave not used by May 31st of any contract year will be calculated at the applicable hourly rate in existence on that date based on the following:

(1) In order to receive payment of the unused portion of sick leave upon the completion of the contract year (May 31st), the employee must have worked ninety (90) days, including holidays, vacations, and compensable jury duty, during the contract year and the employee must have remained on the seniority roster (active or inactive) for the complete contract year (June 1st through May 31st);

(2) A laid-off employee is due sick leave benefits only if that employee meets the qualifications for payment of unused sick leave at the end of the contract year;

(3) Employees who are discharged for cause, or who voluntarily quit, are not eligible for unused sick leave;

(4) Employees who retire, die or are on workers' compensation shall be eligible for unused sick leave provided they have worked ninety (90) days or more during the contract year.

47

**Article 10**

The additional sick leave days referred to above shall also be included in those Supplements containing sick leave provisions prior to June 1, 1976.

**Section 6.**
**Jury Duty**

All employees called for jury duty will receive the difference between eight (8) hours' pay at the applicable hourly wage and actual payment received for jury service for fifteen (15)  days per year for each eligible employee.

When such employees report for jury service on a scheduled workday, they will not be unreasonably required to report for work that particular day.

Time spent on jury service will be considered time worked for purposes of Employer contributions to health and welfare and pension plans, vacation eligibility and payment, holidays and seniority, in accordance with the applicable provisions of the Supplemental Agreements to a maximum of fifteen (15) days per contract year.

It is the intent of this Section to provide compensation for time lost from work because of jury duty. It is applicable only to regular seniority employees. The employee shall receive the difference between eight (8) hours' straight-time pay and the total amount of monies received for jury service.

Regular employees reporting for jury duty on a regularly scheduled workday and serving on a jury shall receive jury duty pay.

Regular employees reporting for jury duty and not selected for jury service shall be required to report for work, if, by reasonable efforts, such employees can complete four (4) or more hours of the normally scheduled workday. In such event, the employee shall be paid eight (8) hours' straight-time pay for the completion of the scheduled shift less total monies received for jury service.

Truckaway and driveaway drivers shall receive jury duty pay if the requirement to report for jury duty prevents the driver from being dispatched. Jury duty payments described above shall be made for each day's work lost as a result of such missed dispatch. Agreed procedures of reporting for dispatch, after a dispatch has been missed, shall apply.

The employee must present proof of jury duty and time of release to the Employer including jury duty pay amounts and the Employer shall pay jury duty pay the next regular pay period after receipt of the required information. Each payment of jury duty pay shall be included in the number of compensable jury days per contract year.

**Article 10**

Jury duty pay does not apply to jury duty served when an employee is on sick leave, funeral leave, workers' compensation, leave of absence or personal time off. Employees shall inform the Employer upon receipt of jury duty notice. Failure to so notify the Employer will result in the disqualification for jury duty pay. When notified, the employee and the Employer shall, by mutual agreement, reschedule any vacation or holiday which may occur during the period of jury service.

An employee on layoff status will not receive jury duty pay unless the requirement to report for jury duty prevents the employee from working for his regular Employer on that day.

## Section 7.
## Family and Medical Leave Act

(a) All employees who worked for the Employer for a minimum of twelve (12) months and worked at least one thousand two hundred fifty (1250) hours during the past twelve (12) months are eligible for unpaid leave as set forth in the Family and Medical Leave Act of 1993. Eligible employees are entitled up to a total of twelve (12) weeks of unpaid leave during any twelve (12) month period for the following reasons:

(1) Birth or adoption of a child or the placement of a child in foster care;

(2) To care for a spouse, child or parent of the employee due to a serious health condition;

(3) A serious health condition of the employee.

(b) The employee is required to provide the Employer with at least thirty (30) days advance notice before FMLA leave begins if the need for leave is foreseeable. If the leave is not foreseeable, the employee is required to give notice as soon as practicable.

(c) The employee's seniority rights shall continue as if the employee had not taken a leave under this section, and the Employer will maintain health insurance coverage during the period of the leave. The Employer may not require the employee to substitute accrued vacation or other paid leave for part of the twelve (12) week period. An employee will not be required to pay any of the contributions for his/her health insurance during FMLA leave except as provided by law.

(d) The provisions of this section are in response to the Federal FMLA and shall not supersede any state or local law which provides for greater employee rights.

(e) Disputes arising under this provision shall be subject to the grievance procedure.

# ARTICLE 11.
## MILITARY CLAUSE

Employees enlisting or entering the military service of the United States, as defined by the provisions of the Uniform Services Employment and Reemployment Rights Act (USERRA), Title 38, U.S. Code Chapter 43, shall be granted all rights and privileges provided by USERRA and/or other applicable state and federal laws.

The Employer shall pay the health and welfare and pension fund contributions on employees on leaves of absence for training in the military reserves or National Guard, but not to exceed thirty (30) days maximum within a calendar year, providing such absence affects the employee's credits or coverage for health and welfare and/or pensions.

Effective the date of ratification, the Employer shall continue to pay Health & Welfare contributions for regular active employees involuntarily called to active duty status from the military reserves or the National Guard during periods of war or military conflict. Such contributions shall only be paid for a maximum period of twenty-four (24) months.

# ARTICLE 12.

## Section 1.
## Posting of Agreement

A copy of this Agreement shall be posted in a conspicuous place in each garage and terminal.

## Section 2.
## Union Bulletin Boards

The Employer agrees to provide suitable space for the Union bulletin board in each garage, terminal or place of work. Posting by the Union on such boards is to be confined to official business of the Union.

The Union bulletin board shall be glassed-in with a lock for which the Employer and the steward shall have a key.

**Article 12**

**Section 3.**
**Lie Detector**

No employee shall be required to take any form of lie detector test as a condition of employment.

**Section 4.**

The Employer may not use video cameras to discipline or discharge an employee for reasons other than theft of property or dishonesty.  If the information on a videotape is to be used to discipline or discharge an employee for theft or dishonesty, the Employer must provide the Local Union, prior to the hearing an opportunity to review the videotape used by the Employer to support the discipline or discharge.


**ARTICLE 13.**
**UNION AND EMPLOYER COOPERATION**

**Section 1.**

The Union, its members, and the Employer agree at all times, as fully as it may be within their power, to further their mutual interest and interests of the Automobile Transporter Industry and the International Brotherhood of Teamsters nationwide.

The Union and the Employer recognize the principle of a fair day's work for a fair day's pay; that jobs and job security of employees working under this Agreement are best protected through efficient and productive operations of the Employer and the Automobile Transporter Industry. The Employer may establish reasonable work standards which shall take into account all factors relating to the work assignment, run, terminal and territorial operational conditions, subject to agreement and approval with the Local Union, and to be filed for approval with the Area Joint Arbitration Committee.

**Section 2.**
**Committee on Industry Development**

The Union and Employer Association or Employer, where applicable, agree to establish a Committee on Industry Development.  The purposes of the Committee are to identify problems causing loss of business and jobs; to direct communication so as to educate employees relative to long-term job security through the Employer, the Local Unions signatory to this Agreement and when deemed necessary and appropriate, to present the views of the Committee to the legislative and executive branches of the federal and state government.  This Committee shall operate as a labor-management committee

51

within the meaning of Section 302(c)(9) of the LMRA, as amended, established and functioning so as to fulfill one or more of the purposes set forth in Section 6(c)(2) of the Labor Management Cooperation Act of 1978. The Committee shall have the full support and commitment of both the International Brotherhood of Teamsters and the Employer Association or Employer, where applicable, in Committee's efforts to identify problems, formulate plans to solve those problems and, where appropriate, conduct joint activities designed to implement the plans.

The Union and Employer Association or Employer, where applicable, will establish procedures for the operation of this Committee.

**Section 3.**

The Employer and the Union together shall establish a National Health Benefits Joint Committee to review the provision of health benefits to employees covered by this Agreement. This Committee is charged with the critical responsibility of ensuring that employee health benefits are made available to employees covered by the terms of the National Master Automobile Transporters Agreement in a secure and cost-efficient manner.

It is anticipated that this Committee shall serve as a source of continuing study regarding the most efficient manner of providing health benefits to covered employees and as a source of continuing guidance, particularly in those instances where an existing Health and Welfare Fund is not capable of maintaining benefits within the contribution level provided under the terms of this Agreement. To the extent covered employees might suffer a reduction in benefits due to the inability of a Health and Welfare Fund to continue to provide existing benefits within the contribution amount provided hereunder, the Joint Committee shall have the responsibility of making recommendations to the affected employees and their Local Unions concerning alternative methods, if possible, of securing comparable health benefits.

The Employer and the Union will establish procedures for the operation of this Committee. The Committee will make periodic reports and recommendations to the National Negotiating Committee concerning the payment for health services by the jointly administered Health and Welfare Funds receiving contributions under the terms of this Agreement.

## ARTICLE 14.
## UNION ACTIVITIES

Any employee member of the Union, acting in any official capacity whatsoever, shall not be discriminated against for acts as such officer of the Union so long as such acts do not interfere with the conduct of the Employer's business, nor shall there be any discrimination against any employee because of Union membership or activities.

Authorized agents of the Union shall have access to the Employer's establishments during work hours for the purpose of adjusting disputes, investigating working conditions, collection of dues, and ascertaining that the agreement is being adhered to; provided, however, there is no interruption of the conduct of the Employer's business.

## ARTICLE 15.
## SEPARATION OF EMPLOYMENT

(a) Upon discharge or upon permanent terminal closing, the Employer shall pay all wages, including vacation pay, in no more than seventy-two (72) hours, excluding Saturdays, Sundays and holidays, due to the employee at the time of discharge or permanent terminal closing. Failure to pay within seventy-two (72) hours of discharge shall subject the Employer to pay liquidated damages in the amount of eight (8) hours pay for each day of delay. Upon quitting, the Employer shall pay all wages, including vacation pay, due to the employee on the payday on which such monies are normally due.

The obligations of the Employer as outlined above are expressly conditioned upon the employee's return of all Employer's property in the employee's custody. Property is to include, without limitation, logs, trip sheets, credit cards, safety equipment, identification cards and all monies advanced to the employee in person and/or by wire.

(b) Any employee discharged away from the home terminal shall be provided the fastest available transportation to the home terminal at the Employer's expense.

## ARTICLE 16.
## SEPARABILITY AND SAVINGS CLAUSE

If any Article or Section of this Agreement or of any Supplements or Riders thereto, should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending the final determination as to its validity, the remainder of this

Agreement and of any Supplement or Rider thereto, or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any Article or Section is held invalid or enforcement of or compliance with which has been restrained, as above set forth, the parties affected thereby shall enter into immediate collective bargaining negotiations after receipt of written notice of the desired amendments by either the Employer or the Union, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint. There shall be no limitation of time for such written notice. If the parties do not agree on a mutually satisfactory replacement within sixty (60) days after receipt of the written notice specified above, either party shall be permitted all legal economic recourse in support of its demands, notwithstanding any provision in this Agreement to the contrary.

## ARTICLE 17.
## EMERGENCY REOPENING

In the event of war, declaration of emergency, imposition of mandatory economic controls, the adoption of a National Health Program or any Congressional or Federal Agency action which has a significantly adverse effect on the financial structure of the Trucking Industry, during the life of this Agreement, either party may reopen the same upon sixty (60) days' written notice and request renegotiation of the provisions of this Agreement directly affected by such action.

Thereafter, the National Joint Arbitration Committee shall enter into immediate negotiations for the purpose of arriving at a mutually satisfactory solution. In the event the National Joint Arbitration Committee cannot agree on a solution to any problem arising from this Article within sixty (60) days after receipt of the stated written notice, either party shall be allowed lawful economic recourse to support their request for revisions. If governmental approval of revisions should become necessary, all parties will cooperate to the utmost to attain such approval. The parties agree that the notice provided herein shall be accepted by all parties as compliance with the notice requirements of applicable law, so as to permit economic action at the expiration thereof.

## ARTICLE 18.
## SYMPATHETIC ACTION

In the event of a labor dispute between any Employer, party to this Agreement, and any International Brotherhood of Teamsters' Union, parties to this or any other International

Brotherhood of Teamsters' Agreement, during the course of which dispute such Union engages in lawful economic activities which are not in violation of this or such other Agreement, then any other affiliate of the International Brotherhood of Teamsters, having an agreement with such Employer, shall have the right to engage in lawful economic activity against such Employer in support of the above first-mentioned Union notwithstanding anything to the contrary in this Agreement or the International Brotherhood of Teamsters' Agreement between such Employer and such other affiliate, with all the protection provided in Article 8.

## ARTICLE 19.
## PIGGY-BACK, BARGE, ETC.

(a) The parties reserve the right to negotiate, during the life of this Agreement, special pay rates and conditions for employees engaged in operations which combine with or are part of other methods of transportation; such as, piggy-back, barge, flexi-van, tri-level, bi-level, etc.  If the parties are unable to agree upon such matters, the Union may engage in lawful economic recourse in support of its demands. Present method of transporting automobiles by barge excluded.

**Local Piggy-back (Rail) Operation**

(b) It is agreed that these operations shall come under the National Master Agreement and Supplements thereto. If there is no rate in a Local Rider covering local piggy-back (rail) operations, where such an operation exists, then said rate shall be negotiated locally. If the parties are unable to reach a satisfactory settlement, the matter shall be referred to the appropriate Joint Area Arbitration Committee which Committee shall hold hearings and attempt to adjust the dispute. In the event the Joint Area Arbitration Committee cannot resolve the dispute, such Committee may by majority vote submit the matter to the National Joint Arbitration Committee for determination. If the Joint Area Arbitration Committee does not by majority vote submit such dispute to the National Joint Arbitration Committee, either party shall be permitted all legal economic recourse in support of their demands. It is understood and agreed that in the event such dispute is submitted to the National Joint Arbitration Committee and such Committee is deadlocked on the dispute, then either party shall be entitled to all lawful economic recourse to support its position in the matter.

(c) Any rates or conditions negotiated by the parties in accordance with Sections (a) or (b) above must be approved by the affected membership and the appropriate Area Joint Arbitration Committee prior to implementation.

## ARTICLE 20.
## JURISDICTIONAL DISPUTES

(a) In the event that any dispute should arise between any Local Unions, parties to this Agreement, Supplements or Riders thereto, or between any Local Union, party to this Agreement, Supplements or Riders thereto, and any other Union relating to jurisdiction over employees or operations covered by such Agreements, the Employer and the Local Union(s) agree to accept and comply with the decision or settlement of the Unions or Union bodies which have the authority to determine such dispute, and such disputes shall not be submitted to arbitration under this Agreement or under any Local Supplement and/or Rider.

(b) The Employer will be notified by the Local Union of the existence of any such jurisdictional dispute which may create Pension Fund withdrawal liabilities for the Employer.  In those cases, the Employer shall be permitted to provide relevant information on that potential liability.  In no event shall this provision create any financial liability for the International Union or its affiliates.

(c) Such disputes shall not be submitted by any party thereto, or affected thereby, to legal or administrative agency proceedings for determination. Pending such determination, the Employer shall not be precluded from seeking appropriate legal or administrative relief against work stoppages or picketing in furtherance of such dispute.

## ARTICLE 21.
## MULTI-EMPLOYER, MULTI-UNION UNIT

Attached to this Agreement as Appendix A is a list of the Employers that are members of the National Automobile Transporters Labor Division and, prior to the negotiation of this Agreement, authorized the Association to negotiate and sign this 2008-2011 collective bargaining agreement covering all of their terminals and operations.  These Employers participate in the multi-employer, multi-union bargaining unit established by this National Master Agreement and the Supplements thereto.

The parties further agree to participate in joint negotiations of any modification or renewal of this National Master Agreement and Supplements thereto, and to remain a part of the multi-employer, multi-union bargaining unit set forth in such renewed Agreement and Supplements.

## ARTICLE 22.
## NEW BUSINESS

**Section 1.**

The Employers and Local Unions agree that for the life of this Agreement and in an effort to secure additional traffic previously unavailable to the bargaining unit the following "new business" concept is adopted.

"New business" may include but not be limited to off rail traffic, secondary market traffic, or traffic secured from a non-Teamster represented employer or entity provided it has not been handled by a Teamster represented employer or entity for one (1) year. "New business" shall not include traffic that has been handled by any Teamster represented employer during the term of this Agreement. This provision shall not apply to traffic that is known or anticipated to be temporary in nature except as otherwise provided for in Section 5.

It is understood that any and all previously agreed to Competitive Agreements shall remain in effect with all rights unimpaired unless mutually agreed to the contrary between the parties involved in the specific Competitive Agreement. This shall include all monetary increases negotiated in this Agreement. Disputes arising under any previously approved Competitive Agreement shall be subject to the grievance procedure outlined in Article 7. In cases of one-sided competitives a Local Union who does not participate will have a one time opportunity to opt in to that competitive provided they opt in under the same conditions of the existing competitive.

**Section 2.**

On all traffic defined as "new business" within the meaning of this Article, the wage rates will be set forth in the respective Supplemental Agreements.

**Section 3.**

On trips defined as "new business" within the meaning of this Article, the following shall apply:

1. In the Central/Southern and Eastern Supplemental Areas the "new business" will pay the full rate on the longest leg and the running mile rate on the shortest leg on two-way trips. In addition, one-half of all deadheaded miles shall be paid at the running mile rate. Drivers' pay for both legs of this two-way haul plus deadhead mileage pay shall not exceed the full/frozen rate for said trips, except that the total mileage pay for the entire trip must be no less than the equivalent of fifty percent (50%) of the total miles traveled at the full multi-car rate. (i.e.: not less than the full running mile rate)

2. In the Central/Southern and Eastern Supplemental Areas any "new business" traffic will pay the full rate on all one-way trips.

3. In the Western Supplemental Area the rate of pay shall be that which is currently in effect each June 1st.

4. On all trips that include one (1) or more units that are not considered "new business" within the meaning of this Article, the appropriate full/frozen contractual wage rate as defined in the appropriate Area Supplement shall apply.

5. Trips involving off rail traffic on two ends obtained after the ratification date of this Agreement, where the mileage to the first drop in each direction is a minimum of five hundred (500) miles, will be paid at the running mile rate on all miles traveled.

**Section 4.**

(a) Any driver dispatched into any foreign terminal or operating point on a two-way haul involving "new business" as defined in this Article may be assigned to run  an intermediate trip.  Such intermediate trip will not break any "new business" two-way trip and shall be paid at the full contractual rate.

(b) Any driver after completing two legs of a dispatch involving "new business" may be assigned a third trip in the direction of the home terminal and will be paid the full contractual rate.

(c) In both cases listed in (a) and (b) above, mileage on such trip will not be used in the computation of the full/running mile formula.

**Section 5.**

The provisions of this Article shall not be applicable to railhead, port facilities, or temporary traffic unless agreed to by the Employer(s) and Local Union(s) affected.

It shall not be a violation of this Article for an Employer and Local Union to enter into an agreement to secure railhead, port facility, or temporary traffic consistent with established wage rates in the applicable Area Supplemental Agreements.

**Section 6.**

All two-way hauls utilized under this "new business" Article will be equalized between the involved locations each thirty (30) days.

**Section 7.**

Prior to implementation of any "new business" haul(s), the Employer(s) shall meet with the Local Union(s) affected and provide such specific information to the involved Local Union(s) regarding the nature and details of its contract with the shipper as is necessary to establish that the traffic is to be considered "new business" within the meaning of this Article and is permanent.

**Section 8.**

Disputes arising under the "new business" provisions of this Article are subject to the National Automobile Transporters Joint Arbitration Committee irrespective of Article 7, Section 9 (a) and 13. If such Committee is deadlocked on any dispute raised, the "new business" provisions of said traffic granted by this Article shall become null and void and the traffic in question shall revert to the established full applicable mileage rates.

# ARTICLE 23.
## COST-OF-LIVING

All employees subject to this Agreement shall be covered by the provisions of a cost-of-living allowance, as set forth in this Article.

The amount of the cost-of-living allowance shall be determined and redetermined as provided below on the basis of the "Consumer Price Index for Urban Wage Earners and Clerical Workers, U.S., All Items (1982-1984 = 100) (CPI-W (1982-1984 = 100)), published by the Bureau of Labor Statistics, U.S. Department of Labor" and referred to herein as the "Index."

The cost-of-living allowance shall only become effective if the annual increase in the CPI-W exceeds three (3.0%) percent.

The cost-of-living allowance, if any, shall become effective on June 1, 2010, based upon the difference between the Index of January, 2009 and the Index for January, 2010 (Published February, 2010).

The Base Index Figure shall be the figure for January, 2009 (Published February, 2009). The cost-of-living increase shall be calculated as follows:

For every .1 point increase in excess of one hundred three percent (103%) of the Base Index of January 2009, there shall be a one cent ($.01) per hour; .50 mills per loaded mile; .25 mills per running mile; .1% flat or zone rate increase in the wage rates for all employees and classifications.

For each additional .1 point increase in the Index there is an additional one cent ($.01) per hour; .50 mills per loaded mile; .25 mills per running mile; .1% flat or zone rate increase in all wage rates.

The cost-of-living increase, if any, shall be applied to the hourly, mileage and flat (zone) rates except where specifically provided otherwise in the Supplemental Agreement. The "frozen rate" will be increased on the same basis as the "loaded mile."

Driveaway employees covered by the driveaway part of the Central-Southern Areas, Eastern Area and Western Area Supplements shall receive cost-of-living adjustments on the same basis as all other employees covered by this National Master Agreement.

For the duration of this Agreement only, any cost-of-living allowance, allocated to hourly, mileage and flat (zone) wage increases, shall become a fixed part of the base rate for all classifications on the effective date of each cost-of-living allowance.

A decline in the Index shall not result in a reduction of classification base rates.

In the event the appropriate Index figure is not issued before the effective date of the cost-of-living adjustment, the cost-of-living adjustment that is required will be made at the beginning of the first (1st) pay period after receipt of the Index and will be made retroactive to the effective date. In the event the Bureau of Labor Statistics should revise or correct an applicable Index figure, any adjustment that may be required in the cost-of-living allowance shall be effective at the beginning of the first (1st) pay period after receipt of the revised or corrected Index figure and no retroactive adjustments will be made.

In the event that the Index shall be revised or discontinued and in the event the Bureau of Labor Statistics, U.S. Department of Labor, does not issue information which would enable the Employer and the Union to know what the Index would have been had it not been revised or discontinued, then the Employer and the Union will meet, negotiate, and agree upon an appropriate substitute for the Index. Upon the failure of the parties to agree in such negotiations within sixty (60) days, thereafter, each party shall be permitted all lawful economic recourse to support its request. The parties agree that the notice provision provided herein shall be accepted by all parties as compliance with notice requirements of applicable law, so as to permit economic action at the expiration thereof.

## ARTICLE 24.

### Section 1.
### Employee's Bail

Employees will be bailed out of jail if accused of any offense in connection with the faithful discharge of their duties, and any employee forced to spend time in jail or in courts shall be compensated at the employee's regular rate of pay. In addition, the employee shall be entitled to reimbursement for meals, transportation, court costs, etc. Provided, however, that faithful discharge of duties shall in no case include compliance with any order involving commission of a felony. In case an employee shall be subpoenaed as an Employer witness, the employee shall be reimbursed for all time lost and expenses incurred.

### Section 2.
### Suspension or Revocation of License

In the event an employee receives a traffic citation for a moving violation while on duty which would contribute to a suspension or revocation or suffers a suspension or revocation of the right to drive the Employer's equipment for any reason, the employee must promptly notify the Employer in writing. Failure to comply will subject the employee to disciplinary action up to and including discharge. An employee failing or unable to return to work as a result of such suspension or revocation of the right to drive the Employer's equipment shall be allowed to retain seniority for a period not to exceed the term of suspension plus thirty (30) days with a maximum of three (3) years. Failure of the employee to successfully reinstate his driving privileges during this period of time shall result in the termination of his/her seniority.

If such suspension or revocation comes as a result of the employee complying with the Employer's instruction, which results in a succession of size and weight penalties or because the employee complied with the Employer's instruction to drive its equipment which is in violation of D.O.T. regulations relating to equipment or because its equipment did not have a speedometer in proper working order which has been reported to the Employer, except in unusual circumstances, and if the employee has notified the Employer of the citation for such violation as mentioned above, the Employer shall provide employment to such employee at not less than the employee's regular earnings at the time of such suspension for the entire period thereof, subject however to the seniority and layoff provisions applicable to the employee at time of the suspension.

An employee unable to successfully pass the D.O.T. Commercial Driver's License (CDL) examination will be allowed to retain seniority for a period not to exceed one (1) year provided the employee makes a good faith effort to pass the test each time the

61

opportunity presents itself.  During this leave of absence the Employer shall have no obligation to make health and welfare or pension contributions on behalf of the employee.

## ARTICLE 25.
## PASSENGERS

No driver shall allow anyone, other than employees of the Employer who are on duty, to ride on the driver's truck, except by written authorization of the Employer, or except in cases of emergency arising out of disabled commercial equipment or an Act of God. This shall not prohibit drivers from picking up other drivers, helpers or others in wrecked or broken down motor equipment and transporting them to the first available point of communication, repair, lodging or available medical attention. This shall not prohibit the transportation of other drivers from the driver's own Employer at a delivery point or terminal to a restaurant for meals where permission has been granted.

## ARTICLE 26.
## NONDISCRIMINATION

The Employer and the Union agree neither to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's age, race, color, religion, sex, national origin, or disability, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of age, race, color, religion, sex or national origin or disability.

The Union and Employer agree to abide by the provisions of the Americans with Disabilities Act or pertinent state laws.  The Employer shall negotiate with the Local Union before providing a reasonable accommodation to a qualified bargaining unit employee.  Any disputes arising under this provision shall be subject to the grievance procedure.

Nothing herein (in seniority or other provisions contained in this National Master Agreement or any approved Area Supplement) shall be construed or applied to deny to any employee the employment opportunities set forth above.

Any alleged denial of the aforesaid opportunities in violation of this Article shall be submitted to the grievance procedure.

In those terminals where classification seniority applies, the parties agree that in filling vacancies with qualified employees which occur subsequent to the execution of this

Agreement, the principle of carry-over terminal seniority shall be recognized. In the event that the Employer and the Local Union fail to formulate a Rider which provides for the filling of vacancies consistent with the foregoing provision, the Joint Area Committees shall have such authority.

## ARTICLE 27.
## ROAD AND/OR DRIVING EQUIPMENT
## SPECIAL LICENSE

If the Employer or a government agency requests a regular employee to qualify on road and/or driving equipment requiring a classified or special license (including a CDL), or in the event an employee is required to qualify (recognizing seniority) on such equipment in order to obtain a better job opportunity with the Employer, the Employer shall allow such regular employee the use of the equipment so required in order to take the examination.  Costs of such license (excluding a CDL) required by a government agency will be paid for by the Employer.

In the event that passports, Fast Passes, TWIC cards or any other form of government-issued identification (excluding birth certificates) or other forms of access credentials are required by the Employer, the Employer's customer(s), government agencies and bodies, or foreign governments, including as a requirement for access to ports, railheads or other locations, the Employer will be responsible for the full cost of same. The Employer will also be responsible for any renewal cost of such documentation; however the cost for replacement of lost or stolen documents will be the responsibility of the employee. Employees who obtain any of the above access credentials on their own shall be reimbursed for the document(s) the Employer requires the employee to possess at a particular location in order to exercise his contractual rights.

In the event that an employee is unable to qualify for the issuance of any such required documentation, the Employer and Local Union will be promptly notified by the employee.  At locations where an employee(s) is unable to obtain any such required documentation, the Local Union and Employer shall be responsible for the establishment of rules dealing with the assignment of work to such employee(s). If the parties fail to reach agreement on such rules, said employee(s) shall work at the bottom of the dispatch board or work schedule until he is able to obtain said documents or rules are established.  In the event that no work opportunity is available, there will be no wage or benefit obligation to the Employer.

Failure of an employee to have the required documentation in his possession at border crossings, loading or unloading locations, or other sites where such documentation is required will not be the basis for delay time or other pay claims for said employee.

**Article 27**

At locations where border crossing is a regular part of the Employer's business, Fast Pass or any other expedited system that becomes available will be obtained by the Employer to expedite crossing into or out of Canada.

No employee will be required to have their driver's license reproduced in any manner except by their employer, law enforcement agencies, government facilities and facilities operating under government contracts that require such identification to enter the facility.

## ARTICLE 28.
## USA-CANADA-MEXICO

Vehicles destined for delivery via truck transportation from the U.S. to Canada and vice-versa, or from the U.S. to Mexico and vice-versa, shall be delivered to an agreed terminal or marshaling area, from which point final delivery of the automotive vehicles shall be made by the drivers in their respective countries. Present agreed practices shall remain in effect.

The parties recognize the mutual interest in implementing slip seat operations as a means of enhancing efficiency and promoting work opportunities. It is agreed that upon the request of an Employer, a Local Union will negotiate an Agreement for slip seat operations within the Continental United States. If the parties are unable to reach a satisfactory agreement, the matter shall be referred to the National Committee. Agreements regarding slip seat operations must be approved by the affected membership and National Committee prior to implementation.

Moreover, the parties recognize the need to protect job security for both U.S. and Canadian domiciled Teamster employees, and the Union and Employer agree to establish a Standing Committee consisting of an equal number of U.S. Company representatives, U.S. Teamster representatives, Canadian Company representatives and Canadian Teamster representatives. This Standing Committee shall meet at least semi-annually and as otherwise necessary to discuss and jointly recommend to their respective Union and Employer Negotiating Committees actions to improve operational objectives, increase work opportunities and further the interests of all affected parties.

It is also recognized that business opportunities and customer demands arise which involve the potential for diversion of cross border traffic and/or support in the respective countries to meet temporary demands enhancing the ability to provide additional bargaining unit jobs and job security for existing employees. To that end, the parties agree that if a particular Employer or Local Union identifies such opportunities and notifies the Co-Chairmen of the National Negotiating Committee of same, those Co-Chairmen will promptly facilitate discussions between the involved U.S. and Canadian

**Article 28**

Local Unions in an attempt to bring about an agreement as to how to fully capitalize on the opportunities in a manner that is equitable to the employees who would be involved.

The parties agree to reopen the provisions of this Article for modification if a significant and relevant change in the law is made which affects transportation across the borders to Canada or Mexico.

## ARTICLE 29.
## JUMBO JETS

It is recognized by both Employers and Unions that during the term of this contract there will come into existence a new and radically different distribution system by manufacturers because of their use of jumbo jets. The parties have reason to believe that instead of being adversely affected as in the case of the tri-level rail cars, the Employers and the Unions could work out an industry plan which would induce the manufacturers to expand their use of truck transportation as a permanent part of their contemplated distribution system.

To carry out such objectives, the National Joint Negotiating Committee shall establish a permanent subcommittee to meet, discuss and carry out any negotiations with representatives of manufacturers and make recommendations to the National Joint Negotiating Committee, which Committee shall, after full hearing, and after further investigation and study, if necessary, make final decisions as it may deem necessary to accomplish the aforementioned objectives.

## ARTICLE 30.
## JOINT HEALTH AND SAFETY COMMITTEE

**Section 1.**

(a) The Employers and the Unions together shall create National and Area Joint Committees of qualified representatives for the purpose of consulting among themselves and with appropriate government agencies, state and federal, on matters involving safety and health of the employees, including highway and equipment safety.

(b) At each terminal location, the Employer and the Local Union shall form a Local Joint Safety Committee composed of both Employer representatives and employees designated by the Local Union, in writing, not to exceed three (3) in number, or any other mutually acceptable number. The Local Joint Safety Committee shall meet at mutually acceptable times and places in order to investigate and adjust matters involving health and safety, damage prevention and night time deliveries. In the event

65

disputes cannot be resolved, such disputes shall be submitted to the appropriate Health and Safety Committee.

**Section 2.**

The parties agree that the Local Unions, the employees and the Employers signatory to this Agreement are obligated to file and process all grievances or complaints involving alleged unsafe or unhealthful workplace conditions pursuant to the grievance procedures of the Agreement in accordance with the following procedures:

(a) When the appropriate Local Union representative receives a written grievance with respect to an occupational safety or health issue, such alleged unsafe or unhealthful condition shall be carefully scrutinized by the Local Union Representative to determine if there is a violation of any legal safety or health standard/regulation or readily apparent safety or health hazard.

1. The National Committee Co-Chairpersons shall designate a Standing Health & Safety Subcommittee composed of eight (8) members consisting of an equal number of Local Union and Employer representatives.

2. A grievance alleging a violation of Article 30, excluding Section 14, shall first be discussed by the Local Union with the designated Company representative within thirty (30) days of the incident leading to the dispute. The nature of the dispute shall be reduced to writing and submitted to the appropriate Company representatives.

3. A local level hearing shall be conducted by the Local Union and Company within ten (10) days after the written grievance is submitted to the Company.

4. In the event the Article 30 dispute is not resolved at the local level hearing, the Local Union and Employer shall jointly prepare a form which shall contain the following information.

a. Specific nature of the violation.

b. Date or dates on which the violation occurred.

c. Employee or employees affected by the alleged violation.

d. The specific provision of the contract, federal or state statute or regulation involved in the Article 30 dispute.

e. Pending governmental agency or judicial proceedings, if any, involving the same subject matter.

**Article 30**

f. Description of the condition sought to be remedied.

g. Nature of the equipment involved, if applicable.

h. A description of the remedy sought by the moving party.

The completed form shall be sent to the National Committee Co-Chairpersons along with the Local Union and Employer's written positions concerning the alleged dispute. This information must be submitted to the National Co-Chairpersons within ten (10) days of the local level hearing.

5. Within ten (10) days of receipt of the aforementioned information two or more subcommittee members shall be designated by the National Co-Chairpersons to meet within thirty (30) days with the Local Union and Employer representatives. They shall submit a written report to the National Committee Co-Chairpersons setting forth their findings within ten (10) days after their meeting with the Local Union and Employer representatives. The Health & Safety Subcommittee is authorized, following an investigation, to direct an Employer to abate any safety hazards that it has a reasonable apprehension will cause serious injury to employees or the public, as defined in Article 30, Section 2(c), until the final disposition of the case at the next regularly scheduled meeting of a panel of the National Health and Safety Committee.

6. The panel of the National Health and Safety Committee shall be composed of an equal number of Local Union and Employer representatives, at least four (4) in number, and shall be appointed by their respective Co-Chairpersons. The Committee shall meet on the first (1st) day of the National Joint Committee's regularly scheduled meeting or at other times designated by mutual agreement by the National Co-Chairpersons. A decision of the National Health and Safety Committee shall be final and binding on all parties, including the Local Union, the Employer and the employees affected.

7. In the event the National Health and Safety Committee is unable to resolve the dispute, it shall be referred to a Board of Arbitration consistent with the provisions of Article 7, Section 9 of the National Agreement.

(b) It may be necessary to secure expert advice with respect to applicable standards, regulations, practices or procedures in order to ensure that grievances will be decided in keeping with legally established standards, regulations, laws and requirements. Such expert advice may be obtained by the appropriate representatives of the Employer and the Union, meeting jointly with the Occupational Safety and Health Administration (OSHA) Area Director or a designated representative; Office of Motor Carrier, Federal Highway Administration (OMC/FHWA) Regional Director or a designated representative, providing complete pertinent information with respect to

67

conditions complained of in the grievance. In addition, the Employer or the Union may call in additional experts for advice on safety and health issues. Any safety or health grievance appealed to each higher level committee as provided in the Agreement must be thoroughly documented and shall include applicable safety and health standards, regulations and all opinions received from OSHA and/or OMC/FHWA officials.

## Imminent Danger/Unsafe Operation

(c) The Employer shall not discharge, discipline, or in any manner discriminate against any employee because such employee (1) refuses to operate equipment not in a safe operating condition (including, but not limited to acknowledged overweight, overlenght or overheight equipment), or equipped with the safety appliances prescribed by law; (2) refuses to operate equipment where such operation constitutes a violation of any federal rules, regulations, standards, or orders applicable to commercial motor vehicle safety and health; or, (3) refuses to work because of a reasonable apprehension of serious injury to himself/herself or the public.  The unsafe conditions causing the employee's apprehension of injury must be of such nature that a reasonable person under the circumstances then confronting the employee would conclude that there is a bona fide danger of an accident, injury or serious impairment of health resulting from the unsafe condition.  In order to qualify for protection under this provision, the employee must have sought from the Employer, and have been unable to obtain, correction of the unsafe condition, where practicable.

(d) All equipment which the employee refuses to operate because it is not mechanically sound or properly equipped shall be appropriately tagged so that it cannot be used by other employees until the maintenance department has adjusted the complaint.  After such equipment is repaired, the Employer shall place on such equipment an "OK" in a conspicuous place so the employee can see the same.

(e) Night Operations

(1) The Employer recognizes safety hazards may result from night operations, and agrees to negotiate with the affected Local Union provisions to abate these unsafe conditions.

(2) The Employer acknowledges its obligation to negotiate dispatch and work rules relating to night time deliveries.  Existing night delivery programs shall remain in effect subject to the right of the parties to change by mutual agreement.

(3) An employee who has a reasonable apprehension of serious injury resulting from delivering to a particular dealer at night must immediately bring this unsafe condition to the attention of the Employer.  The Employer shall immediately (within twenty-four (24) hours, excluding Saturday, Sunday or holidays) attempt to alleviate the unsafe

conditions.  The Employer and Local Union must agree that the unsafe condition was alleviated or does not exist for the dealer to continue on the night delivery list.

To qualify for this provision the unsafe conditions causing the employee's apprehension of injury must be of such nature that a reasonable person under the circumstances then confronting the employee would conclude that there is a bona fide danger of an accident, injury or serious impairment of health resulting from the unsafe condition.

(4) The Employer agrees that equipment utilized in the night delivery operations shall be equipped with adequate lighting.

(5) General questions arising under this subsection shall be first submitted to the terminal safety committee designated in Article 30, Section 1(b).

(f) In order to accommodate random inspections made by OSHA or  OMC/FHWA of the workplace without notice to the Employer or the Union, each Local shall designate at least two (2) individuals at each major establishment of the Employer as the employee representative to accompany the inspector of any OSHA or OMC/FHWA inspection that may occur. The Employer shall be notified of the name of such designated persons to be kept on file at each establishment.

**Section 3.**
**Tires**

(a) There shall be no recap tires on steering axle of any units.

**Shock Absorbers**

(b) With the purchase of newly manufactured tractors which are placed in service after March 1, 1981, and with the understanding that there will be no retrofit of equipment currently in use, the following shall apply:

Where the manufacturer recommends and provides shock absorbers as standard equipment with the tractor front suspension assembly, properly maintained shocks on such new equipment shall be considered as a necessary and integral part of that assembly. Where the manufacturer does not recommend and provide shock absorbers as standard equipment with the tractor front suspension assembly, shocks shall not be considered as a necessary or integral part of that suspension system.

Any alleged violation of the above, including maintenance of existing equipment, shall not be cause for refusal of the equipment, but shall be reported to the Employer and the Local Union, and if not corrected promptly, be subject to the grievance procedure and is to be treated as a safety and health issue.

**Article 30**

**Brake Linings**

(c) As new equipment is ordered or existing equipment requires brake lining replacement, all brake linings shall be of nonasbestos material where available and certifiable.

**Section 4.**

All new equipment ordered on or after September 1, 1973, and permanently assigned to the fleet, shall be equipped with air-ride or air-suspension type seats on the driver side, and such seats shall be maintained in reasonable operating condition. Any seat which must be replaced on existing equipment shall be replaced with an air-ride seat.

All new equipment ordered after December 18, 1995 shall be equipped with air-ride or air-suspension type seats which shall oscillate and have adjustable lumbar support, height, backrest and seat tilt devices.

The term air-ride seats set forth above applies to truck tractor seats variously described by manufacturers as air-ride, spring loaded and/or torsion bar (hydraulic) suspension which are manually and/or automatically adjustable to weight and height.

Drivers shall not be required to ride as a passenger on company owned or leased equipment unless a second comfortable, fixed and cushioned seat equipped with safety belt is provided.

In case the Employer puts in a sleeper operation, the passenger seat will be the same kind of seat as the driver seat (air seat for both sides). The Employer shall be required to maintain those seats.

**Section 5.**
**Air-conditioning**

Newly manufactured tractors which are added to the fleet, subsequent to June 1, 1991, shall be air-conditioned.

Air-conditioning units shall be maintained in proper operating condition. If an air conditioner is out of service and written up at time of arrival at home terminal it must be repaired before the next dispatch. If an air-conditioning unit, which was not written up as inoperable at its most recent arrival at an employee's home terminal, fails to operate at the time of dispatch and repair is not readily available, repairs may be delayed for a maximum of twenty-four (24) hours. If an air conditioning unit becomes inoperable during a trip, repairs will be made immediately unless repairs will be completed at a Company terminal within twenty-four (24) hours of notification to the Company of the

70

need for repairs.  Drivers will be compensated for time spent waiting for the repairs to be completed; provided, however, that in no case shall any employee be paid more than eight (8) hours out of every twenty-four (24) hour period as set forth in the breakdown provisions of the respective Area Supplemental Agreements.

All air conditioners shall be of sufficient capacity to adequately condition the air in the equipment cabs.

Effective on the ratification date of the contract, all newly acquired yard vans shall be equipped with air conditioners.

**Section 6.**

No driver shall be required to drive a tractor designed with the cab under the trailer.

**Section 7.**

(a) All road and city equipment shall have a speedometer and tachometer operating with reasonable accuracy.

(b) Heated Mirrors - New equipment placed in service shall be equipped with heated mirrors.  The heated mirrors shall be maintained in a proper operating condition.  In the event a heated mirror requires repair and is written up at the time of arrival at the home terminal, it will be repaired before the next dispatch.  If the heated mirror fails to work at time of dispatch and repairs are not readily available, the repair may be postponed until the unit's next arrival at the home terminal.

(c) All equipment shall be equipped with a horn which meets applicable federal, state and local specifications.

(d) Fuel gauges shall be maintained in proper working order.

(e) Tag or lift axle switches shall be installed on the driver's right hand side within clear view of the driver.

(f) In addition to the lighting required by applicable law, the Employer shall install flashers on the side or the top of the trailer on all new equipment ordered after December 18, 1995.

(g) In the event the Employer lowers the air bags on loaded equipment in order to achieve compliance with legal height restrictions, the Employer must release the employee from any responsibility for any damage caused to the air bags or equipment as a direct result of such action.  Upon request of the employee, the Employer must acknowledge this

**Article 30**

release in writing.

(h) If loading or unloading is required at an Employer controlled facility after daylight hours, sufficient lighting to allow the employees to safely perform their duties shall be furnished.  In addition, if the facility is not under the Employer's direct control, the Employer shall take reasonable steps to attempt to ensure that adequate lighting is furnished by the responsible party.

(i) All vehicle walking surfaces and work areas, excluding loading skids, shall be coated with non-skid paint or surface coating. Such paint or surface coating shall be regularly maintained.

(j) The Employer will ensure that drivers hauling used cars will have access to an accurate height gauge at the loading facility or be provided with a height stick.  The Employer will not be responsible for replacement of height sticks which it issues.

**Section 8.**

The National Joint Health and Safety Committee created by this Article shall meet and review the health and safety aspects of interior dimensions of tractors, and the feasibility of compliance with SAE recommended practices relating to commercial vehicle equipment including, without limitation, recommended practices J941-E, J1052, J1521, J1522, J1516, J1517, and J1100.  The Committee shall also review safety considerations relating to proper steps, handholds, catwalks, hydraulically operated skids, etc. to allow drivers to safely load and unload; problems with chains, cables and tie-down bars; problems related to windshield visibility; and the feasibility of equipping sleeper berths with air-ride or air-suspension foundation technology. The Committee shall further review safety considerations relating to feasibility of handrails and cables on headrack ramps, swing decks and upper decks of tractors and trailers.  The National Joint Health and Safety Committee shall complete its review and report its recommendations to the National Joint Arbitration Committee by January 3, 2004.

If loading is required at an Employer controlled facility after daylight hours, sufficient lighting to safely perform duties shall be furnished.

**Section 9.**
**Trailer Hand Brake Valves**

(a) Employers shall continue to install trailer hand brake valves in newly purchased equipment consistent with the automobile transporter industry practice.

(b) The Employers reserve the right to alter this policy with notice at such time that:

72

**Article 30**

       (1) the manufacturers commence a policy of eliminating trailer hand brake valves as standard equipment; or

       (2) technological advances make trailer hand brake valve systems obsolete and such systems are replaced with federally approved revised braking systems.

       (c) Any alleged violation of the above, including maintenance of equipment, shall not be cause for refusal of the equipment but shall be reported to the Employer and the Local Union and if not corrected promptly, shall be subject to the grievance procedure and is to be treated as a safety and health issue.

**Section 10.**
**Fuel Tank Placement**

The following minimum critical measurement will apply only to tractors added to the fleet after March 1, 1981, with the understanding that there shall be no retrofit of equipment currently in use:

       (a) Front of Fuel Tank* to Rear of Front Tire -

Not less than four (4) inches.

       (b) Rear of Fuel Tank* to Front of Duals -

Not less than four (4) inches where there is no push (dead) axle; not less than two (2) inches where there is a push (dead) axle.

       (c) Bottom of Fuel Tank* to Ground -

For trucks with a wheel base of up to and including 151 inches, provide clearance of no less than six (6) inches measured on a flat surface.  For trucks with a wheel base greater than 151 inches, provide clearance of no less than eight (8) inches measured on a flat surface.

*"Fuel Tank" includes brackets, return lines, etc., in determining clearances - i.e., minimum clearances must be maintained inclusive of fuel tank and attachments.

Effective on the ratification date of the contract, all newly acquired line haul (i.e. regularly assigned to road) equipment shall be equipped with fuel tanks with a minimum capacity of one hundred (100) gallons.

**Article 30**

Any alleged violation of the above requirements shall not be cause for refusal of the equipment, but shall be reported to the Employer and the Local Union and, if not corrected promptly, be subject to the grievance procedure.

**Section 11.**
**Skids**

Recognizing that employees in this industry are obligated to utilize skids as an essential part of their duties, it is appropriate that the Employers purchase and maintain skids which can be used as safely as possible.

(a) The Employer will purchase and maintain skids of light-weight (i.e., aluminum or composite) material.  Any needed repairs will be promptly made by the Employer.

(b) The Employer will train new employees in the proper and safest use of skids that are being utilized by the individual Employer. The Employer will further provide retraining if a new type of skid is put into use or if it becomes apparent a driver is improperly using the skids causing injury or damage.

(c) Any alleged violation of the above, including maintenance of existing equipment, shall not be cause for refusal of the equipment, but shall be reported to the Employer and the Local Union and, if not corrected promptly, be subject to the grievance procedure and is to be treated as a safety and health issue.

**Section 12.**
**Head Ramp Stops**

The Employer shall install head ramp stops with a minimum height of three (3) inches, or chain pockets with a minimum depth of three (3) inches, on all new equipment.

**Section 13.**
**Right to Know**

The Employer shall make available, upon request of an employee or employee representative, information on the chemical identity of hazardous materials used in the maintenance shops and the health hazards associated with their use.  Information shall be in the form of a Material Safety Data Sheet, which shall be maintained in the workplace and be made readily accessible to employees during working hours.

The Employer shall train employees in the proper handling of hazardous materials annually and initially when new materials are handled.  Training shall also include an explanation of the health hazards and any physical hazards of the materials.

**Article 30**

The Employer agrees to provide where necessary, or required, personal protective equipment and devices without cost to the employees.

**Section 14.**
**Substance Abuse Testing and Disciplinary Action**

The Union and Employer acknowledge the enactment of federal regulations regarding mandatory alcohol and drug testing of specified employees in the trucking industry which provide for testing for the misuse of alcohol and the use of controlled substances pursuant to detailed protocol and procedures. The Uniform Substance Abuse Policy which was implemented by each signatory Employer on December 1, 1989, as amended to conform to the current federal regulations, is hereby adopted as the drug and alcohol testing program for the industry. It is agreed that the Uniform Substance Abuse Policy will be modified in the event that further federal legislation or Department of Transportation regulations provide for revised testing methodologies or requirements. The Employer will not utilize hair or saliva testing methods under this Article unless mandated by law.

In addition to the provisions contained in the Substance Abuse Policy, the following terms and conditions shall be considered a part of the industry's drug and alcohol testing program. To the extent of any conflict, the following terms and conditions shall prevail.

**A.     Reasonable Cause Testing.**

Whenever the Employer has reasonable cause to believe that the actions, appearance or conduct of an employee while on duty are indicative of the misuse of alcohol or the use of a controlled substance, the employee will be required to undergo an alcohol and/or drug test, and will be taken out of service pending results of such test.

The conduct of the employee must be witnessed by at least two supervisors, if at all feasible. If only one supervisor is available, only one supervisor need witness the conduct. The witnesses must have received training in the detection of probable drug use and alcohol misuse by observing a person's behavior. Any witness in such a case will be required to complete a Supervisor's Report of Conduct, which Report shall be prepared and signed by the witness within twenty-four (24) hours of the observed behavior or before the results of the drug test are released, whichever is earlier. In the case of drug tests, the Report will be forwarded to the Medical Review Officer for review and consideration along with any positive test results.

In any reasonable cause circumstance, an Employer representative will transport the individual to an appropriate collection/testing facility and await the completion of the collection/testing procedure. The Employer representative will then transport the employee back to the Employer's premises.

Where reasonable cause drug testing is to be conducted, the employee will be required to provide a urine specimen for laboratory testing.

If requested, the employee will sign a consent form authorizing the clinic to collect a specimen of urine and release the results of the urine laboratory testing to his/her Employer's Medical Review Officer (MRO), in the case of D.O.T. covered employees, but shall not be required to waive any claim or cause of action under the law.

An employee may raise an affirmative defense that the positive test result was attributable to the proper use of a prescription medication. If the employee raises such a defense to the Employer, at the employee's request, the Employer shall refer the employee to a qualified physician to discuss the employee's explanation for the positive test result. The qualified physician may decide that there is a legitimate explanation and declare the test to be negative. The employee may be required to provide evidence that a prescription has been lawfully prescribed by a physician.

A refusal to provide a specimen will constitute a presumption of intoxication and/or the use of a controlled substance, and the employee will be subject to discharge without the receipt of a prior warning letter.

Immediately after the specimen is provided, the individual collection bottles shall, in the presence of the employee, be sealed, labeled and then initialed by the employee. The employee has an obligation to identify each  bottle and initial same. The specimens shall be placed in the transportation container after being drawn. The container shall be sealed in the employee's presence and the employee given an opportunity to initial the container and witness his/her social security number placed on the container. The container shall be sent to the designated testing laboratory on that day or the soonest normal business day by air courier or other fastest available method.

Urine Sample Kit (Reasonable Cause Kit)

The contents of the urine sample kit shall be as follows:

1.      Security seals for sealing and initialing each collection container; and tamper-proof shipping seals or sealing flaps for securing the exterior of the kit.

2.      Two (2) screw-capped self-sealing tamper-resistant urine collection bottles of appropriate capacities.

3.      Instructions for specimen collection.

A chain of possession form shall be completed by the hospital/clinic personnel during specimen collection and returned with the urine specimen before sealing the entire kit. The exterior of the collection kit must then be secured (e.g., by placing the tamper-proof shipping seals over the outlined tab areas, or sealing the flaps if so provided). If possible, have the employee initial the seals or flaps.

Urine testing shall be performed in strict accordance with federally mandated laboratory procedures regarding screening, confirmation and reporting of results, as reflected in the Substance Abuse Policy.

## B.      Leave of Absence Prior to Testing.

An employee shall be permitted to take a leave of absence for the purpose of undergoing treatment pursuant to an approved program of alcoholism or drug use. The leave of absence must be requested prior to a positive test result or the commission of any act subject to disciplinary action.

Such leave of absence shall be granted on a one-time basis and shall be for a maximum of sixty (60) days unless extended by mutual agreement. While on such leave, the employee shall not receive any of the benefits provided by this Agreement or Supplements thereto except continued accrual of seniority, nor does this provision amend or alter the disciplinary provision.

Employees requesting to return to work from a leave of absence for drug use or alcoholism shall be required to submit to testing as provided for in Part (E) of this Section. Failure to do so will subject the employee to discipline including discharge without the receipt of a prior warning letter.

The above provisions shall not apply to probationary employees.

## C.      Disposition in Event of Positive Test Result

Federal regulations provide specific consequences for employees who test positive for the misuse of alcohol and the use of controlled substances. In addition, such employees may be subject to discipline, up to and including discharge, depending upon the circumstances surrounding the taking of the test and the nature of the test results. Based upon those regulations, policies and contractual terms, the following consequences will apply:

**Article 30**

1.    Pre-employment Tests

Any individual who tests positive on a pre-employment drug test or who is deemed to have tested positive under the provisions of the drug testing procedures, will be eliminated from further consideration for employment.

2.    Reasonable Cause Drug Tests

In cases of reasonable cause drug tests, if the urine test is positive, the employee will be subject to discharge.

3.    Post Accident Drug Tests

Any employee who tests positive in a post-accident drug test will be immediately taken out of service and in addition will be referred to a Substance Abuse Professional (SAP) and be subject to the return to duty testing discussed below and SAP requirements set forth in the Uniform Substance Abuse Policy.

4.    Random Drug Tests

Any employee who tests positive on a random drug test will be immediately taken out of service and in addition will be referred to a Substance Abuse Professional (SAP) and be subject to the return to duty testing discussed below and SAP requirements set forth in the Uniform Substance Abuse Policy.

5.    Follow-up Drug Tests

Any employee who tests positive on a follow-up drug test will be subject to discharge.

6.    Post-Accident Alcohol Tests

In the event that a post-accident alcohol test shows a breath alcohol concentration of 0.02 or greater, the employee will be subject to discharge.

**Article 30**

7.    Reasonable Cause, Random and Follow-up Alcohol Tests

In cases of reasonable cause, random and follow-up alcohol tests, the consequences of a positive test will depend on the breath alcohol level and whether, when the test is administered, the employee has already performed driving functions on that day.

(a) If the employee has not yet performed driving functions:

(1) If the test results show a breath alcohol concentration of 0.02 or greater but less than 0.04, he/she will be immediately taken out of service and not permitted to return to service until the start of his/her next regular duty period, but no less than 24 hours following administration of the test.

(2) If the test results show a breath alcohol concentration of 0.04 or greater, he/she will be immediately taken out of service, be referred to a Substance Abuse Professional and be subject to the return to duty testing requirements discussed below and the SAP requirements set forth in the Uniform Substance Abuse Policy; and in addition will be subject to the following progressive discipline:

First (1st) offense:  twenty-four (24) hour suspension
Second (2nd) offense within eighteen (18) months:  Five (5) day disciplinary suspension
Third (3rd) offense within eighteen (18) months of the first offense: Twenty (20) day disciplinary suspension
Fourth (4th) offense within eighteen (18) months of the first offense:  Subject to discharge

The disciplinary time involved will be the minimum which he/she will be out of service, in that evaluation by the SAP and any required counseling, treatment or rehabilitation may consume more than those minimums.

(3) He/she will be subject to discharge if the test results show a breath alcohol concentration equal to or above the level established by state law for alcohol intoxication.

(b) If the employee has already performed driving functions on that day, he/she will be subject to discharge if the test results show a breath alcohol concentration of 0.02 or greater.

**Article 30**

Any employee who fails or refuses to submit to a random drug or alcohol test, on a timely basis as directed by the Employer in accordance with the requirements of D.O.T. regulations, will be deemed to have tested positive and will be immediately taken out of service; and in addition thereto will be subject to disciplinary action, up to and including discharge.

**D.    Paid-for Time.**

An employee who is required to submit to a random drug or alcohol test will be paid at the appropriate hourly rate for the time required in traveling to and from, and spent at, the collection/testing site.  When requested by an employee, the Employer will provide transportation to and from the test site for all tests.

All time spent by an employee attending a D.O.T. mandated educational program shall be paid for by the Employer.

**E.    Return to Duty After a Positive Test**

Any employee taken out of service as a result of a positive drug test or an alcohol test where the results show a breath alcohol concentration of 0.04 or greater, who is not otherwise subject to discharge, must undergo a return to duty drug or alcohol test after receipt of the written evaluation of the SAP, referred to above, indicating that no further assistance is necessary, before being returned to service.  In cases involving drugs, the return to duty test will be given no less than seven (7) days from receipt by the Company of the initial test result.  In cases involving alcohol the test will be given on the day of receipt of the SAP evaluation or at the expiration of any period of disciplinary suspension, whichever occurs first.  If the employee tests negative,  he/she will be immediately returned to service upon receipt of the written test results.

If the employee tests positive for drugs on such return to duty test, or if the return to duty alcohol test shows a breath alcohol concentration of 0.02 or greater, the employee will remain out of service.  If the test is positive for drugs or the alcohol BAC is 0.04 or greater, he/she will again be referred to a SAP and will be subject to the requirements of Section 8 above.  Such an alcohol result of 0.04 or greater will also be considered a subsequent offense under the progressive discipline described in Section C.7 above.

An employee who tested 0.02 to 0.039 BAC on his/her first return to duty test must undergo a second return to duty test twenty-four (24) hours after the first return to duty test.  An employee who tested positive for drugs or 0.04 or greater BAC for alcohol must undergo a second return to duty test after receipt by the Company of the written evaluation of the SAP that no further assistance is necessary.  In such cases involving drugs, the test will be given no less than thirty (30) days after receipt of the prior test results.  In such cases involving alcohol, the test will be given on the day of receipt or at

**Article 30**

the expiration of any period of disciplinary suspension, whichever occurs first. If the employee tests positive for drugs or shows a breath alcohol concentration of 0.02 or greater, he/she will be subject to discharge.

**Section 15.**

All new equipment ordered on or after the date of ratification will be provided with quick release ratchets. All quick release ratchets shall be properly maintained.

**Section 16.**

The Employer shall comply with all applicable federal, state and local regulations pertaining to worker safety and health and subjects covered by Article 30. Failure to do so shall be subject to the grievance procedure and any other remedies prescribed by law.

**Section 17.**

Employees and authorized Union representatives shall have access to all written occupational safety and health programs implemented, utilized or instituted by the Employer. Upon request, the Employer shall provide a copy of the program to the authorized Union representative free of charge.

**Section 18.**

The Employer shall ensure that cab integrity is maintained in accordance with the Federal Motor Carrier Safety Regulations, Part 393.84, by providing that the flooring in all motor vehicles shall be substantially constructed, free of unnecessary holes and openings, and shall be maintained so as to minimize the entrance of fumes, exhaust gases or fires. Floors shall not be permeated with oil or other substances likely to cause injury to persons using the floor as a traction surface.

**Section 19.**

The Employer shall not require a driver to drive in excess of ten (10) hours within a tour of duty. It will also be the employee's option whether to utilize a thirty-four (34) hour restart or the seventy (70) hours in eight (8) day rule.

**Section 20.**

All garage facilities must be equipped with ventilation for the removal of exhaust fumes and dust.

## ARTICLE 31.
## UNIFORMS

The Employer agrees that if any employee is required to wear any kind of uniform as a condition of continued employment, such uniform shall be furnished and maintained by the Employer, free of charge, at the standard required by the Employer.

After the expiration of any contractual relation with existing suppliers, future order of uniforms will be Union-made in the United States and shall bear the Teamster logo.

Drivers shall be required to wash uniforms when supplied by the Employer.

Where the Employer requires uniforms, including coveralls, to be worn and is in the process of instituting a uniform program or replacing existing uniforms, including coveralls, the Employer and the Union are instructed to meet with suppliers, where possible, to determine the types of uniforms, including coveralls and materials available. The employees shall have a choice by majority election of the material available to be used.  The choice of the majority shall be binding on all employees.

Voluntary pooling arrangements for the purchase of uniforms shall not come within the scope of this Article.

The Employer shall replace all clothing, glasses, hearing aids and/or dentures not covered by company insurance or workers' compensation which are destroyed or damaged in a wreck or fire with company equipment.

## ARTICLE 32.
## METRIC SYSTEM

Recognizing that the standard of measure in the United States is to be converted to the metric system in the near future, it is agreed that a special committee will be appointed to study the revised pay scales that will eventually result, such as "Cents per Kilometer, etc." and report during the life of this contract on procedure for the conversion factor from miles to kilometers, etc.

## ARTICLE 33.
## WORK PRESERVATION

**Section 1.**

For the purpose of protecting and preserving Carhaul Work (as defined in the Work Preservation Agreement for Signatory Employers, but excluding office units except as provided in the Western Area Office Supplement) for the Employer's bargaining unit employees, eliminating contracting and double breasting practices under which Employer permits persons other than Employer's bargaining unit employees to perform Carhaul Work, and preventing any scheme or subterfuge to avoid the protection and preservation of Carhaul Work under this Agreement, the Employer agrees that it shall not undertake to, nor permit any Controlled Affiliate (including freight broker companies as these terms are defined in the Work Preservation Agreement for Signatory Employers) to subcontract, transfer, lease, divert, contract, assign or convey, in full or in part, any Carhaul Work to any Controlled Affiliate, plant, business, person or non-unit employees other than Employer, or to any other mode of operation, except as explicitly and specifically provided for and permitted in the NMATA and/or applicable Supplemental Agreements.

The Employer agrees that it shall not permit any Controlled Affiliate other than Employer to perform any Carhaul Work and that no Carhaul Work shall be performed by any Controlled Affiliate other than Employer.

**Section 2.**

None of the above limitations shall apply and do not prohibit the following activities by the Employer:

(a) Trip leases, load exchange and return haul arrangements, otherwise not in violation of this Agreement or its Supplemental Agreements, between Employers within the multi-employer unit;

(b) Assignment or subcontract of maintenance-related work involving the specific areas designated below:

(1) Work not presently assigned to the bargaining unit;

(2) Where the Employer does not have appropriate facilities, available equipment or employees with requisite skills to perform the specific maintenance work and has no employees on layoff in job classifications affected by the assignment or subcontracting;

83

**Article 33**

(3) Taking advantage of original warranties (i.e. 100% parts and labor) or guarantees for the maintenance and repair of new equipment, including replacement engines and component parts, where such original warranties or guarantees are provided by the supplier at no extra cost to the Employer.  The Union will be permitted to examine copies of any warranties;

(4) Repair work performed at points en route as needed;

(5) Road call work will be based on past practice.

**Section 3.**

(a) All grievances alleging a violation of Article 33, Section 1 (excluding grievances raising issues under Article 33, Section 2 (b)) and grievances alleging a violation of the Work Preservation Agreements which have been incorporated into and printed with this Agreement must be reduced to writing and presented to the Employer no later than thirty (30) days after the dispute or grievance arises and shall be processed in the expedited manner set forth below.

(1) **Grievance Form**.

A grievance alleging a violation of Article 33, Section 1 or a violation of the Work Preservation Agreement shall be reduced to writing by the Local Union utilizing a form containing the following information:

(i) Identity of the party filing the grievance;

(ii) Identity of the signatory Employer and the alleged double-breasted company, if applicable;

(iii) Description of the bargaining unit work that has been diverted;

(iv) The date the party became aware of the alleged violation;

(v) The date the local level hearing was held; and

(vi) The specific remedy sought.

(2) **Answer**.

The Parent or Employer named in the grievance shall provide a written response to the grievance within ten (10) days of their receipt of the grievance, fully describing the reasons relied upon in support of the position taken and providing

documents that are relied upon in support of the position.

(3) **Expedited Local Level Hearing Procedures**.

(i) A local level hearing must be held within fifteen (15) days from the date of the Company's receipt of the grievance.

(ii) At the local level hearing, the parties shall verify that the grievance is appropriate for expedited arbitration.  If the parties are unable to agree, the parties shall put their respective positions in writing and forward them to the National Co-Chairpersons along with the completed grievance form.  Only the grievant, Steward and full-time employees of the Local Union and the Employer shall be present and/or participate in the local level hearing.

(4) The National Joint Arbitration Committee Union and Employer Co-Chairpersons shall convene within fifteen (15) days from receipt of the fully completed grievance form and position letters from the parties to determine whether the grievance is appropriate for expedited arbitration.  In the event the National Joint Arbitration Committee Co-Chairpersons are unable to agree, the grievance shall be referred directly to the Board of Arbitration.

(5) **Board of Arbitration**.

The Board of Arbitration shall consist of the following three (3) members:

(i) One (1) member to be appointed by the Union Co-Chairperson of the National Joint Arbitration Committee;

(ii) One (1) member to be appointed by the Employer Co-Chairperson of the National Joint Arbitration Committee; and

(iii) The two (2) Co-Chairpersons of the National Joint Arbitration Committee shall appoint a third (3rd) neutral arbitrator from the list of arbitrators created under Article 7, Section 9.

The Board of Arbitration shall have the authority to interpret and apply the provisions of the Work Preservation Agreement, this Agreement or Supplements thereto, where appropriate, but shall not have the authority to amend or modify the Work Preservation Agreement, this Agreement or Supplements thereto or establish new terms and conditions under the Work Preservation Agreement, this Agreement or Supplements thereto.

Article 33

(b) The cost of the neutral arbitrator shall be shared equally by both the Local Union and the Employer involved.  In the event the Employer or the Local Union is responsible for the Board of Arbitration's failure to timely process the grievance as provided in Section 3(c) below, the party responsible for the delay shall be obligated for the full cost of the neutral arbitrator.  A case may be postponed only once by written mutual agreement of the parties.

(c) The Board of Arbitration shall schedule a standing four-day hearing session for the week following the quarterly meeting of the National Joint Arbitration Committee (the "Standing Session") in which the Board of Arbitration shall hear and dispose of each Work Preservation Grievance filed in the prior calendar quarter.

In the event that more than two (2) Work Preservation Grievances are scheduled for a Standing Session, the Board of Arbitration may, by unanimous vote of its members, schedule additional hearing days within fifteen (15) days of the conclusion of the Standing Session.  The Board of Arbitration shall issue its decision on each Work Preservation Grievance submitted to the Standing Session within sixty (60) days of the conclusion of the hearing on the Work Preservation Grievance.

(d) If the Board of Arbitration determines that the Employer or any party to the Work Preservation Agreements has violated Article 33, Section 1 or the Work Preservation Agreement, then the Board of Arbitration may in addition to and without prejudice to any other remedy, (1) order specific performance of the Employer's obligations under the Agreement and include an appropriate cease and desist order in its remedy and (2) order the Employer to compensate the affected employees covered by the Agreement for any and all wages and benefits lost by such employees.

(e) The National Union Committee, the Local Union and the Employer shall comply with any final decision of the Board of Arbitration in all respects within ten (10) days of the final decision without regard to whether the National Union Committee, the Local Union or the Employer has brought any action or proceeding to review, modify, enforce, confirm, vacate or set aside the decision.  An Employer or Union challenging a decision issued by a Board of Arbitration in the above manner shall pay the other party the cost of such challenge, including the Court costs and reasonable attorneys fees if the Court does not modify or vacate the Board of Arbitration decision.

(f) The provisions of Article 7, Section 9 (d) and (f) shall not apply to the Board of Arbitration proceeding arising under these provisions; the Board of Arbitration shall not be obligated to render decisions at the time of the hearing; and Briefs may be filed by any party, including TNATINC, the Local Union, and the Employer.

**Article 33**

**Section 4.**
**Right to Information**

In the event that a Work Preservation Grievance is submitted, the Employer or Union may request, in writing, specific relevant information, documents or materials pertaining to such grievance and the other party shall respond to such request within fifteen (15) days of the receipt of such request.

If, and to the extent that, the Employer or the Union fails or refuses to comply with this request for information, for any reason, the Employer or the Union may request a subpoena duces tecum from the majority of the Board of Arbitration requiring that the information be produced by the Employer or the Union or any other entity or person.  If, and to the extent that the subpoenaed party fails or refuses to comply with a subpoena issued by the majority of the Board of Arbitration, the Union or the Employer may seek enforcement of the subpoena in federal court pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended.

If, and to the extent that the Employer or Union fails to comply with this provision for any reason, the other party may argue that the Board of Arbitration should draw an adverse inference concerning the subject matter of the information that the party failed to provide the other party within fifteen (15) days.

**Section 5.**

Employers shall not relocate existing operations to locations outside of the jurisdiction of a Local Union signatory to this Agreement for the purpose of evading this Agreement.

If new operations are established by a signatory Employer, the Employer will negotiate in good faith with the affected Local Union regarding staffing.

(See separate attachment of Work Preservation Agreements.)

**ARTICLE 34.**
**SLEEPER CAB OPERATIONS**

**Section 1.**

An Employer may establish a sleeper cab operation, i.e., two (2) man operation, to be covered by this Agreement.  It must negotiate with the involved Local Unions all conditions affecting the operations prior to effectuating the sleeper cab operation.

87

**Article 34**

Agreements reached must be submitted for approval to the respective Area Committee, or National Committee if a multiconference sleeper cab operation is involved, prior to implementation.  Any rates or conditions negotiated by the parties in accordance with this Article must be approved by the affected membership prior to implementation.

**Section 2.**

First outbound drop must be no less than five hundred (500) miles from home terminal except for existing approved runs.  This applies to the Central-Southern Area and Eastern Area Supplemental Agreements only.

**Section 3.**

Effective on the date of ratification, when ordering new sleeper cab equipment, the Employer shall specify the following minimum dimensions for the sleeper berths:

|        |       |
|--------|-------|
| Length | 80"   |
| Width  | 34"   |
| Height | 24"   |

These minimum sleeper cab dimensions shall not be modified to accommodate head racks or for any other purpose.

**Section 4.**

Sleeper berths shall be equipped with individual heat and air conditioning controls.  In addition to the air-ride or air-suspension seats required by Article 30, Section 4, sleeper cabs shall be equipped with a second (2nd) air-ride or air-suspension seat which is secured to the floor.

All new equipment ordered after December 18, 1995 shall be equipped with air-ride or air-suspension type passenger seats which shall oscillate and have adjustable lumbar support, height, backrest and seat tilt devices.

All sleeper cab equipment will be equipped with air ride or air suspension.

**Section 5.**

Sleeper equipment purchased after December 18, 1995 shall be equipped with a power window on the passenger side that is operable from the driver side of cab.

**Article 34**

**Section 6.**

The Employer must provide and maintain an adequate supply of clean linens and blankets.

## ARTICLE 35.
## DURATION

**Section 1.**

This Agreement shall be in full force and effect from June 1, 2008, to and including May 31, 2011, and shall continue from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other at least sixty (60) days prior to the date of expiration.

When notice of cancellation or termination is given under this Section, the Employer and the Union shall continue to observe all terms of this Agreement until impasse is reached in negotiations, or until either the Employer or the Union exercise their rights under Section 3 of this Article.

**Section 2.**

When no such cancellation or termination notice is served and the parties desire to continue said Agreement but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a notice at least sixty (60) days prior to May 31, 2011, or May 31st, of any subsequent contract year, advising that such party desires to revise or change terms or conditions of such Agreement.

**Section 3.**

Revisions agreed upon or ordered shall be effective as of June 1, 2011 or June 1st, of any subsequent contract year.

The Teamsters National Automobile Transporters Industry Negotiating Committee, as representative of the Local Unions, or the signatory Employer, or the authorizing Employer Associations, shall each have the right to unilaterally determine when to engage in economic recourse (strike or lockout) on or after June 1, 2011, unless agreed to the contrary.

**Article 35**

**Section 4.**

In the event of an inadvertent failure by either party to give the notice set forth in Sections 1 and 2 of this Article, such party may give such notice at any time prior to the termination or automatic renewal date of this Agreement. If a notice is given in accordance with the provisions of this Section, the expiration date of this Agreement shall be the sixty-first (61st) day following such notice.

**Section 5.**

In those circumstances where the Teamsters National Automobile Transporters Industry Negotiating Committee, as representative of the Local Union, or the signatory Employer, or the authorizing Employer Association, shall have served a notice of reopening pursuant to this Article and have not been able to arrive at an agreement within six (6) months, then either side shall have the right on sixty (60) days' written notice to terminate the Agreement.

IN WITNESS WHEREOF the undersigned duly execute THE NATIONAL MASTER AUTOMOBILE TRANSPORTERS AGREEMENT and Supplemental Agreements (and Riders, if any) pertaining to their operations, on this _____ to be effective as of June 1, 2008.

## FOR THE UNION

LOCAL UNION No. _____ affiliate of International Brotherhood of Teamsters.


By _____
(Signed)


Its _____
(Title)


## FOR THE COMPANY


_____
(Company)


By _____
(Signed)


Its _____
(Title)

## NEGOTIATING COMMITTEE

FOR THE LOCAL UNIONS:

### TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS INDUSTRY NEGOTIATING COMMITTEE

James P. Hoffa, Chairperson
Fred Zuckerman, Co-Chairperson

| | |
|---|---|
| Bill Alexander | Louie Miller |
| Joe Barios | Kevin Moore |
| Robert Doss | Jimmy Neal |
| Matthew Fazakas | Ken Nelligan |
| George Gerdes | Mark Ruggerio |
| Terry Hewer | Tony Scott |
| Paul Houck | Earl Walker |
| Walt Lytle | Robert Watts |

FOR THE EMPLOYERS:

### NATIONAL AUTOMOBILE TRANSPORTERS LABOR DIVISION

James D. Osmer, Chairperson

| | |
|---|---|
| Allen Cassens | Bruce Jackson |
| Joe Citarello | Greg May |
| Mark Gendregske | James Walker |
| Robert Hutchison | |

92

**APPENDIX A**
**NATLD MEMBERS**

Active Transportation Company
Active USA, Inc.
Allied Systems, Ltd.
Annapolis Junction Rail Solutions, LLC
Cassens Transport Company
DMT Trucking, Inc.
Jack Cooper Transport, Inc.
Pacific Motor Trucking Company
RCS Transportation, LLC
Transport Support, Inc.
Twin Oaks of PA, LLC

# WORK PRESERVATION AGREEMENT
# FOR SIGNATORY EMPLOYERS

This Work Preservation Agreement (the "Agreement") is made and entered into in accordance with Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, by and among the undersigned employer party to the 2008-2011 National Master Automobile Transporters Agreement (the "NMATA") as identified in Article 1, Section 1 of the NMATA and/or applicable Supplemental Agreements (hereinafter referred to as "Employer"), and the undersigned Local Unions affiliated with the International Brotherhood of Teamsters that are parties to the NMATA as identified in Article 1, Section 2 of the NMATA and the Teamsters National Automobile Transporters Industry Negotiating Committee ("TNATINC") (hereinafter collectively referred to as "Union").

1. Union and Employer enter into this Work Preservation Agreement for the purpose of protecting and preserving Carhaul Work for the Employer's bargaining unit employees, eliminating contracting and double breasting practices under which Parent or Employer permit persons other than Employer's bargaining unit employees to perform Carhaul Work, and preventing any scheme or subterfuge to avoid the protection and preservation of Carhaul Work under this Agreement.

2. Employer agrees that it shall not undertake to, nor permit any Controlled Affiliate (including freight broker companies) to, subcontract, transfer, lease, divert, contract, assign or convey, in full or in part, any Carhaul Work to any Controlled Affiliate, plant, business, person or non-unit employees other than Employer, or to any other mode of operation, except as explicitly and specifically provided for and permitted in the NMATA and/or applicable Supplemental Agreements.

3. Employer agrees that it shall not permit any Controlled Affiliate other than Employer to perform any Carhaul Work and that no Carhaul Work shall be performed by any Controlled Affiliate other than Employer, except as permitted herein.

4. Employer agrees that it will not engage in any scheme, transaction, restructuring or reorganization that permits it or any Controlled Affiliate either to evade the protection of Carhaul Work for Employer's bargaining unit employees under this Agreement or to perform or assign or to permit the performance or assignment of any Carhaul Work outside the terms and conditions of this Agreement, the NMATA and applicable Supplemental Agreements, except as permitted herein.  The Employer shall give written notification to the Union within fifteen (15) working days of the effective date of any acquisition (i.e. majority interest) by the Employer of any entity engaged in Carhaul Work as defined in Paragraph 10 (a) of this Work Preservation Agreement.

5. Employer and Union waive any and all rights to assert that this Agreement or Article 33 of the NMATA violates any law or legal principle.  Neither party will bring any legal challenge or action of any form concerning the validity of this Agreement or Article 33 of the NMATA, nor permit any Controlled Affiliate to bring any such legal action, nor

94

voluntarily provide any support to any person or entity that brings any such legal action; provided, however, that nothing in this paragraph 5 shall be construed to prohibit Union, Employer or any Controlled Affiliate from responding to a properly issued subpoena or similar legal process.

6. In the event that any provision of this Agreement or Article 33 of the NMATA is voided, invalidated or enjoined by a final decision of any court or government agency, then (a) the parties intend and agree that this Agreement shall be construed to provide the Union and the Employer's bargaining unit employees with the broadest permissible work preservation protection against subcontracting and double breasting practices consistent with governing law, and (b) Union and Employer shall each have the option to reopen collective bargaining negotiations over the NMATA, any Supplemental Agreement and/or this Agreement, in whole or in part, notwithstanding the duration clause contained in Article 35 of the NMATA.

7. All grievances or disputes concerning the interpretation or application of this Agreement shall be resolved in final and binding arbitration before the Board of Arbitration established in Article 33, Section 3 of the NMATA and pursuant to the procedure described in Article 33, Section 3 of the NMATA.

8. In the event Union submits a grievance involving Employer under the expedited arbitration procedure established in Article 33, Section 3, Employer and Union shall provide all information, documents or materials that are relevant in any way to the Union's grievance within fifteen (15) days of the receipt of any written request for such information, documents or materials by the Union or Employer. If, and to the extent that, the Employer or the Union fails or refuses to comply with this request for information, for any reason, the Employer or the Union may request a subpoena duces tecum from the majority of the Board of Arbitration requiring that the information be produced by the Employer or the Union or any other entity or person.  If, and to the extent that the subpoenaed party fails or refuses to comply with a subpoena issued by the majority of the Board of Arbitration, the Union or the Employer may seek enforcement of the subpoena in federal court pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended.  If, and to the extent Employer or Union fails to comply with this provision for any reason, the Union or Employer may argue that the Board of Arbitration should draw an adverse inference against Employer or Union concerning the subject matter of the information that Employer or Union has failed to provide to Union or Employer within fifteen (15) days.

9. The Employer's obligations under this Agreement shall be binding upon its successors, administrators, executors and assigns.  The Employer agrees that the obligations of this Agreement shall be included in any agreement of sale, transfer or assignment of the business.  In the event an entire operation or a portion thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.  Transactions covered by this provision

include stock sales or exchanges, mergers, consolidation or spin-offs or any other method by which business is transferred.

In the event the Employer fails to require the purchaser, the transferee or lessee to agree to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement.

The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee or other entity involved in the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which the operations covered by this Agreement may be transferred.

Such notice shall be in writing, with a copy to the Union, at the time the seller, transferor or lessor makes the purchase and sale negotiation known to the public or executes a contract or transaction as herein described, whichever first occurs. The Union shall also be advised of the exact nature of the transaction, not including financial details.

This section shall not impose any independent obligations under the NMATA, its supplements or this Agreement on any holding company that owns or controls Parent.

10. The following definitions shall apply to certain of the capitalized terms in this Agreement:

a. *Carhaul Work*. The term "Carhaul Work" means and includes any and all present work and future work opportunities of the kind, nature and type currently, historically or traditionally performed by the Employer's bargaining unit employees in connection with the over-the-road transportation of motor vehicles, including without limitation the transportation of motor vehicles to or from automobile dealers, manufacturers, plants, railheads, ports or staging yards; associated loading and unloading work; associated shuttle work and releasing work; associated maintenance work and yard work; and any other work of the type performed by any employee classification covered by the NMATA and/or applicable Supplemental Agreements. The parties agree and confirm that "Carhaul Work" is not limited to the specific work assignments presently, historically and hereafter performed by the Employer's bargaining unit employees but also includes any and all future work opportunities that are identical or similar in nature to such work and that the Employer's bargaining unit employees have the necessary skills and ability to perform.

b. *Controlled Affiliate*. Any person or entity shall be deemed to be a "Controlled Affiliate" of Employer if Employer, whether directly or indirectly through common ownership or common management owns a majority ownership or majority

96

voting interest in such entity and (i) maintains the power, right or authority to control, manage or direct such entity's day-to-day operations, or (ii) maintains the power, right or authority to assign, or direct the assignment, or veto or block the assignment of Carhaul Work to such entity, or to prevent such entity from performing Carhaul Work.

11. The rights and obligations created under this Agreement shall be in addition to those created under Article 33 of the NMATA. This Agreement shall be incorporated into and printed with the NMATA.

12. This Agreement shall remain in full force and effect concurrently with the NMATA and shall not be altered, amended, canceled or terminated by Employer, except as provided for in Article 35 of the NMATA.

By:_____

Its:_____

Dated:_____

TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS
INDUSTRY NEGOTIATING COMMITTEE (TNATINC),
on behalf of itself and LOCAL UNIONS
affiliated with the International
Brotherhood of Teamsters

By:_____

Its:_____

Dated:_____

## ACTIVE TRUCK TRANSPORT, L.L.C.
## WORK PRESERVATION AGREEMENT

This Work Preservation Agreement (the "Agreement") is made and entered into in accordance with Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, by and among (1) the undersigned employer parties to the 2008-2011 National Master Automobile Transporters Agreement (the "NMATA") as identified in Article 1, Section 1 of the NMATA and/or applicable Supplemental Agreements (hereinafter referred to as "Employer"), (2) Active Truck Transport, L.L.C. parent to Active USA, Inc. (hereinafter referred to as "Parent"), and (3) the undersigned Local Unions affiliated with the International Brotherhood of Teamsters that are parties to the NMATA as identified in Article 1, Section 2 of the NMATA and the Teamsters National Automobile Transporters Industry Negotiating Committee ("TNATINC") (hereinafter collectively referred to as "Union").

1. Parent, Union and Employer enter into this Work Preservation Agreement for the purpose of protecting and preserving Carhaul Work for the Employer's bargaining unit employees, eliminating contracting and double-breasting practices under which Parent or Employer permit persons other than Employer's bargaining unit employees to perform Carhaul Work, and preventing any scheme or subterfuge to avoid the protection and preservation of Carhaul Work under this Agreement.

2. Parent and Employer agree that neither Parent nor Employer shall undertake to, or permit any Controlled Affiliate (including freight broker companies) to subcontract, transfer, lease, divert, contract, assign or convey, in full or in part, any Carhaul Work to any Controlled Affiliate, plant, business, person or non-unit employees other than Employer, or to any other mode of operation, except as explicitly and specifically provided for and permitted in the NMATA and/or applicable Supplemental Agreements.

3. Parent and Employer agree that neither Parent nor Employer shall permit any Controlled Affiliate other than Employer to perform any Carhaul Work and that no Carhaul Work shall be performed by any Controlled Affiliate other than Employer, except as permitted herein.

4. Parent and Employer agree that they will not engage in any scheme, transaction, restructuring or reorganization that permits Parent, Employer or any Controlled Affiliate either to evade the protection of Carhaul Work for Employer's bargaining unit employees under this Agreement or to perform or assign or to permit the performance or assignment of any Carhaul Work outside the terms and conditions of this Agreement, the NMATA and applicable Supplemental Agreements, except as permitted herein.  The Parent and/or Employer shall give written notification to the Union within fifteen (15) working days of the effective date of any acquisition (i.e. majority interest) by the Parent or Employer of any entity engaged in Carhaul Work as defined in Paragraph 10 (a) of this Work Preservation Agreement.

5. Parent, Employer and Union agree that they waive any and all rights to assert that this Agreement or Article 33 of the NMATA violates any law or legal principle and that they will not bring any legal challenge or action of any form concerning the validity of this Agreement or Article 33 of the NMATA, permit any Controlled Affiliate to bring any such legal action, or voluntarily provide any support to any person or entity that brings any such legal action; provided, however, that nothing in this paragraph 5 shall be construed to prohibit Union, Parent, Employer or any Controlled Affiliate from responding to a properly-issued subpoena or similar legal process.

6. In the event that any provision of this Agreement or Article 33 of the NMATA is voided, invalidated or enjoined by a final decision of any court or government agency, then (a) the parties intend and agree that this Agreement shall be construed to provide the Union and the Employer's bargaining unit employees with the broadest permissible work preservation protection against subcontracting and double-breasting practices consistent with governing law, and (b) Union and Employer shall each have the option to reopen collective bargaining negotiations over the NMATA, any Supplemental Agreement and/or this Agreement, in whole or in part, notwithstanding the duration clause contained in Article 35 of the NMATA.

7. Parent agrees that all grievances or disputes concerning the interpretation or application of this Agreement shall be resolved in final and binding arbitration before the Board of Arbitration established in Article 33, Section 3 of the NMATA and pursuant to the procedure described in Article 33, Section 3 of the NMATA.  Parent hereby expressly agrees to voluntarily submit to and be fully bound by the expedited arbitration and information exchange procedures established in Article 33, Sections 3 and 4 of the NMATA in all respects as if every reference to the term "Employer" in those Sections also expressly refers to, includes and binds Parent.  However, it is understood and agreed that Parent is not a signatory to the NMATA or any of its various supplements and is not, solely by virtue of this Agreement, single or joint employer with the signatory Employer(s).

8. In the event Union submits a grievance involving Parent and/or Employer under the expedited arbitration procedure established in Article 33, Section 3, Parent and Employer and Union shall provide all information, documents or materials that are relevant in any way to the Union's grievance within fifteen (15) days of the receipt of any written request for such information, documents or materials by the Union, Parent, or Employer.  If, and to the extent that, the Parent, the Employer or the Union fails or refuses to comply with this request for information, for any reason, the Parent, the Employer or the Union may request a subpoena duces tecum from the majority of the Board of Arbitration requiring that the information be produced by the Parent, the Employer or the Union or any other entity or person.  If, and to the extent that the subpoenaed party fails or refuses to comply with a subpoena issued by the majority of the Board of Arbitration, the Union, the Parent or the Employer may seek enforcement of the subpoena in federal court pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended.  If, and to the extent Parent, Employer or Union

99

fails to comply with this provision for any reason, the Union, Parent or Employer may argue that the Board of Arbitration should draw an adverse inference against Parent, Employer or Union concerning the subject matter of the information that Parent, Employer or Union has failed to provide to Union, Parent or Employer within fifteen (15) days.

9. The Parent and Employer's obligations under this Agreement shall be binding upon its successors, administrators, executors and assigns.  The Parent and Employer agree that the obligations of this Agreement shall be included in the agreement of sale, transfer or assignment of the business.  In the event an entire operation or a portion thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.  Transactions covered by this provision include stock sales or exchanges, mergers, consolidation or spin-offs or any other method by which business is transferred.

In the event the Parent or Employer fails to require the purchaser, the transferee or lessee to agree to assume the obligations of this Agreement, the Parent or Employer (including partners thereof) shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement.

The Parent or Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee or other entity involved in the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which the operations covered by this Agreement may be transferred.

Such notice shall be in writing, with a copy to the Union, at the time the seller, transferor or lessor makes the purchase and sale negotiation known to the public or executes a contract or transaction as herein described whichever first occurs.  The Union shall also be advised of the exact nature of the transaction, not including financial details.

This section shall not impose any independent obligations under the NMATA, its supplements or this Agreement on any holding company that owns or controls Parent.

10. The following definitions shall apply to certain of the capitalized terms in this Agreement:

a. *Carhaul Work*.  The term "Carhaul Work" means and includes any and all present work and future work opportunities of the kind, nature and type currently, historically or traditionally performed by the Employer's bargaining unit employees in connection with the over-the-road transportation of motor vehicles, including without

limitation the transportation of motor vehicles to or from automobile dealers, manufacturers, plants, railheads, ports or staging yards; associated loading and unloading work; associated shuttle work and releasing work; associated maintenance work and yard work; and any other work of the type performed by any employee classification covered by the NMATA and/or applicable Supplemental Agreements.  The parties agree and confirm that "Carhaul Work" is not limited to the specific work assignments presently, historically and hereafter performed by the Employer's bargaining unit employees but also includes any and all future work opportunities that are identical or similar in nature to such work and that the Employer's bargaining unit employees have the necessary skills and ability to perform.

b. *Controlled Affiliate*.  Any person or entity shall be deemed to be a "Controlled Affiliate" of Parent and/or Employer if Parent or Employer, whether directly or indirectly through common ownership or common management owns a majority ownership or majority voting interest in such entity and (i) maintains the power, right or authority to control, manage or direct such entity's day-to-day operations, or (ii) maintains the power, right or authority to assign, or direct the assignment, or veto or block the assignment of Carhaul Work to such entity, or to prevent such entity from performing Carhaul Work.

11. The rights and obligations created under this Agreement shall be in addition to those created under Article 33 of the NMATA.  This Agreement shall be incorporated into and printed with the NMATA.

12. This Agreement shall remain in full force and effect concurrently with the NMATA and shall not be altered, amended, canceled or terminated by either Parent or Employer, except as provided for in Article 35 of the NMATA.

For the Parent:

ACTIVE TRUCK TRANSPORT, L.L.C.

By:_____

Its:_____

Dated:_____

101

For the Employer:

ACTIVE USA, INC.


By:_____

Its:_____

Dated:_____


For the Union:

TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS
INDUSTRY NEGOTIATING COMMITTEE (TNATINC),
on behalf of itself and LOCAL UNIONS
affiliated with the International
Brotherhood of Teamsters


By:_____

Its:_____

Dated:_____


## ALLIED SYSTEMS HOLDINGS, INC. AND ALLIED AUTOMOTIVE GROUP, INC. WORK PRESERVATION AGREEMENT

This Work Preservation Agreement (the "Agreement") is made and entered into in accordance with Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, by and among (1) the undersigned employer parties to the 2008-2011 National Master Automobile Transporters Agreement (the "NMATA") as identified in Article 1, Section 1 of the NMATA and/or applicable Supplemental Agreements (hereinafter referred to as "Employer"), (2) the Employers' corporate parent Allied Automotive Group, Inc.  (hereinafter referred to as "Parent"), which controls or maintains the right to control Employer, QAT, Inc., Inter Mobile, Inc., Legion Transportation, Inc., Allied Freight Brokers, Inc., B&C Company, and other wholly-owned subsidiaries, (3) the Employers' ultimate corporate Parent Allied Systems Holdings, Inc. (hereinafter referred to as "Ultimate Parent"), which controls or maintains the right to control Employers, Allied Automotive Group, Inc., and Axis Group, Inc., and other wholly-owned subsidiaries, and (4) the undersigned Local Unions affiliated with the International Brotherhood of Teamsters that are parties to the NMATA as identified in Article 1, Section 2 of the NMATA and the Teamsters National Automobile Transporters Industry Negotiating Committee ("TNATINC") (hereinafter collectively referred to as "Union").

102

1. Ultimate Parent, Parent, Employer and Union enter into this Work Preservation Agreement for the purpose of protecting and preserving Carhaul Work for the Employer's bargaining unit employees, eliminating contracting and double-breasting practices under which Ultimate Parent, Parent or Employer permit persons other than Employer's bargaining unit employees to perform Carhaul Work, and preventing any scheme or subterfuge to avoid the protection and preservation of Carhaul Work under this Agreement.

2. Ultimate Parent, Parent and Employer agree that neither Ultimate Parent, Parent nor Employer shall undertake to, or permit any Controlled Affiliate (including freight broker companies) to subcontract, transfer, lease, divert, contract, assign or convey, in full or in part, any Carhaul Work to any Controlled Affiliate, plant, business, person or non-unit employees other than Employer, or to any other mode of operation, except as explicitly and specifically provided for and permitted in the NMATA and/or applicable Supplemental Agreements.

3. Ultimate Parent, Parent and Employer agree that neither Ultimate Parent, Parent nor Employer shall permit any Controlled Affiliate other than Employer to perform any Carhaul Work and that no Carhaul Work shall be performed by any Controlled Affiliate other than Employer.

4. Ultimate Parent, Parent and Employer agree that they will not engage in any scheme, transaction, restructuring or reorganization that permits Ultimate Parent, Parent, Employer or any Controlled Affiliate either to evade the protection of Carhaul Work for Employer's bargaining unit employees under this Agreement or to perform or assign or to permit the performance or assignment of any Carhaul Work outside the terms and conditions of this Agreement, the NMATA and applicable Supplemental Agreements, except as permitted herein.  The Ultimate Parent, Parent and/or Employer shall give written notification to the Union within fifteen (15) business days of the effective date of any corporate or business entity restructuring or reorganization relating to the Ultimate Parent, Parent or Employer, and/or acquisition (i.e. majority interest) by the Ultimate Parent, Parent, Employer or any agent thereof, of any entity engaged in Carhaul Work.

5. Ultimate Parent, Parent, Employer and Union agree that they waive any and all rights to assert that this Agreement or Article 33 of the NMATA violates any law or legal principle and that they will not bring any legal challenge or action of any form concerning the validity of this Agreement or Article 33 of the NMATA, permit any Controlled Affiliate to bring any such legal action, or voluntarily provide any support to any person or entity that brings any such legal action; provided, however, that nothing in this paragraph 5 shall be construed to prohibit Union, Ultimate Parent, Parent, Employer or any Controlled Affiliate from responding to a properly-issued subpoena or similar legal process.

6. In the event that any provision of this Agreement or Article 33 of the NMATA is voided, invalidated or enjoined by a final decision of any court or government agency, then (a) the parties intend and agree that this Agreement shall be construed to provide the Union and the Employer's bargaining unit employees with the broadest permissible work preservation protection against subcontracting and double-breasting practices consistent with governing law, and (b) Union and Employer shall each have the option to reopen collective bargaining negotiations over the NMATA, any Supplemental Agreement and/or this Agreement, in whole or in part, notwithstanding the duration clause contained in Article 35 of the NMATA.

7. Ultimate Parent, Parent agrees that all grievances or disputes concerning the interpretation or application of this Agreement shall be resolved in final and binding arbitration before the Board of Arbitration established in Article 33, Section 3 of the NMATA and pursuant to the procedure described in Article 33, Section 3 of the NMATA. Ultimate Parent, Parent hereby expressly agrees to voluntarily submit to and be fully bound by the expedited arbitration and information exchange procedures established in Article 33, Sections 3 and 4 of the NMATA in all respects as if every reference to the term "Employer" in those Sections also expressly refers to, includes and binds Ultimate Parent and Parent. At the arbitration hearing, once the Union has established common ownership or management between the Ultimate Parent, Parent or the Employer and the alleged Controlled Affiliate and the fact that the alleged Controlled Affiliate is performing Carhaul Work as that term is defined in the Work Preservation Agreement, the burden of proof shall shift to the Ultimate Parent, the Parent or the Employer to establish that the Ultimate Parent, the Parent or the Employer does not maintain the power, right and authority to control, manage and direct such entity's day-to-day operations, and that the Ultimate Parent, the Parent or the Employer does not maintain the power, right and authority to assign, and direct the assignment, and veto or block the assignment of Carhaul Work to such entity, or to prevent such entity from performing Carhaul Work.

8. In the event Union submits a grievance involving Ultimate Parent, Parent and/or Employer under the expedited arbitration procedure established in Article 33, Section 3, Ultimate Parent, Parent and Employer shall provide all information, documents or materials that are relevant in any way to the Union's grievance within fifteen (15) days of the receipt of any written request for such information, documents or materials by the Union. The Ultimate Parent/Parent/Employer or the Union may request a subpoena duces tecum from the majority of the Board of Arbitration requiring that the information be produced by the Ultimate Parent/Parent/Employer or the Union or any other entity or person. If, and to the extent that, the subpoenaed party fails or refuses to comply with a subpoena issued by the majority of the Board of Arbitration, the Union or the Ultimate Parent/Parent/Employer may seek enforcement of the subpoena in federal court pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended. If and to the extent Ultimate Parent, Parent, Employer or the Union fails to comply with this provision for any reason, Ultimate Parent, Parent, Employer or the Union may argue that the Board of Arbitration should draw an adverse

inference against Ultimate Parent, Parent, Employer or the Union concerning the subject matter of the information that Ultimate Parent, Parent, Employer or Union have failed to provide to Union, Ultimate Parent, Parent or Employer within fifteen (15) days.

9. The Ultimate Parent, Parent and Employer's obligations under this Agreement shall be binding upon its successors, administrators, executors and assigns.  The Ultimate Parent, Parent and Employer agree that the obligations of this Agreement shall be included in the agreement of sale, transfer or assignment of the business.  In the event an entire operation or a portion thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.  Transactions covered by this provision include stock sales or exchanges, mergers, consolidation or spin-offs or any other method by which business is transferred.

In the event the Ultimate Parent, Parent or Employer fails to require the purchaser, the transferee or lessee to agree to assume the obligations of this Agreement, the Ultimate Parent, Parent or Employer (including partners thereof) shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement.

The Ultimate Parent, Parent or Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee or other entity involved in the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which the operations covered by this Agreement may be transferred.

Such notice shall be in writing, with a copy to the Union, at the time the seller, transferor or lessor makes the purchase and sale negotiation known to the public or executes a contract or transaction as herein described whichever first occurs.  The Union shall also be advised of the exact nature of the transaction, not including financial details.

10. The following definitions shall apply to certain of the capitalized terms in this Agreement:

a. *Carhaul Work*.  The term "Carhaul Work" means and includes any and all present work and future work opportunities of the kind, nature and type currently, historically or traditionally performed by the Employer's bargaining unit employees in connection with the over-the-road transportation of motor vehicles, including without limitation the transportation of motor vehicles to or from automobile dealers, manufacturers, plants, railheads, ports or staging yards; associated loading and unloading work; associated shuttle work and releasing work; associated maintenance work and yard work; and any other work of the type performed by any employee

classification covered by the NMATA and/or applicable Supplemental Agreements.  The parties agree and confirm that "Carhaul Work" is not limited to the specific work assignments presently, historically and hereafter performed by the Employer's bargaining unit employees but also includes any and all future work opportunities that are identical or similar in nature to such work and that the Employer's bargaining unit employees have the necessary skills and ability to perform.

   b. *Controlled Affiliate.*  Any person or entity shall be deemed to be a "Controlled Affiliate" of Ultimate Parent, Parent and/or Employer if Ultimate Parent, Parent or Employer, whether directly or indirectly through common ownership or common management owns a majority ownership or majority voting interest in such entity and (i) maintains the power, right or authority to control, manage or direct such entity's day-to-day operations, or (ii) maintains the power, right or authority to assign, or direct the assignment, or veto or block the assignment of Carhaul Work to such entity, or to prevent such entity from performing Carhaul Work.

  11. The rights and obligations created under this Agreement shall be in addition to those created under Article 33 of the NMATA.  This Agreement shall be incorporated into and printed with the NMATA.

  12. This Agreement shall remain in full force and effect concurrently with the NMATA and shall not be altered, amended, canceled or terminated by either Ultimate Parent, Parent or Employer, except as provided for in Article 35 of the NMATA.

For the Ultimate Parent:

ALLIED SYSTEMS HOLDINGS, INC.

By:_____

Its:_____

Dated:_____


For the Parent:

ALLIED AUTOMOTIVE GROUP, INC.


By:_____

Its:_____

Dated:_____

For the Employer:

ALLIED SYSTEMS, LTD.
F.J. BOUTELL DRIVEAWAY COMPANY, INC.
TRANSPORT SUPPORT, INC.


By:_____

Its:_____

Dated:_____


For the Union:

TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS
INDUSTRY NEGOTIATING COMMITTEE (TNATINC),
on behalf of itself and LOCAL UNIONS
affiliated with the International
Brotherhood of Teamsters


By:_____

Its:_____

Dated:_____


## CASSENS CORPORATION
## WORK PRESERVATION AGREEMENT

This Work Preservation Agreement (the "Agreement") is made and entered into in accordance with Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, by and among (1) the undersigned employer party to the 2008-2011 National Master Automobile Transporters Agreement (the "NMATA") as identified in Article 1, Section 1 of the NMATA and/or applicable Supplemental Agreements (hereinafter referred to as "Employer"), (2) the Employer's corporate parent Cassens Corporation (hereinafter referred to as "Parent"), and (3) the undersigned Local Unions affiliated with the International Brotherhood of Teamsters that are parties to the NMATA as identified in Article 1, Section 2 of the NMATA and the Teamsters National Automobile Transporters Industry Negotiating Committee ("TNATINC") (hereinafter collectively referred to as "Union").

1. Parent, Union and Employer enter into this Work Preservation Agreement for the purpose of protecting and preserving Carhaul Work for the Employer's bargaining unit employees, eliminating contracting and double-breasting practices under which Parent or Employer permit persons other than Employer's bargaining unit employees to perform Carhaul Work, and preventing any scheme or subterfuge to avoid the protection and preservation of Carhaul Work under this Agreement.

2. Parent and Employer agree that neither Parent nor Employer shall undertake to, or permit any Controlled Affiliate (including freight broker companies) to, subcontract, transfer, lease, divert, contract, assign or convey, in full or in part, any Carhaul Work to any Controlled Affiliate, plant, business, person or non-unit employees other than Employer, or to any other mode of operation, except as explicitly and specifically provided for and permitted in the NMATA and/or applicable Supplemental Agreements.

3. Parent and Employer agree that neither Parent nor Employer shall permit any Controlled Affiliate other than Employer to perform any Carhaul Work and that no Carhaul Work shall be performed by any Controlled Affiliate other than Employer, except as permitted herein.

4. Parent and Employer agree that they will not engage in any scheme, transaction, restructuring or reorganization that permits Parent, Employer or any Controlled Affiliate either to evade the protection of Carhaul Work for Employer's bargaining unit employees under this Agreement or to perform or assign or to permit the performance or assignment of any Carhaul Work outside the terms and conditions of this Agreement, the NMATA and applicable Supplemental Agreements, except as permitted herein. The Parent and/or Employer shall give written notification to the Union within fifteen (15) working days of the effective date of any acquisition (i.e. majority interest) by the Parent or Employer of any entity engaged in Carhaul Work as defined in Paragraph 10 (a) of this Work Preservation Agreement.

5. Parent, Employer and Union agree that they waive any and all rights to assert that this Agreement or Article 33 of the NMATA violates any law or legal principle and that they will not bring any legal challenge or action of any form concerning the validity of this Agreement or Article 33 of the NMATA, permit any Controlled Affiliate to bring any such legal action, or voluntarily provide any support to any person or entity that brings any such legal action; provided, however, that nothing in this paragraph 5 shall be construed to prohibit Union, Parent, Employer or any Controlled Affiliate from responding to a properly-issued subpoena or similar legal process.

6. In the event that any provision of this Agreement or Article 33 of the NMATA is voided, invalidated or enjoined by a final decision of any court or government agency, then (a) the parties intend and agree that this Agreement shall be construed to provide the Union and the Employer's bargaining unit employees with the broadest permissible work preservation protection against subcontracting and double-breasting practices

108

consistent with governing law, and (b) Union and Employer shall each have the option to reopen collective bargaining negotiations over the NMATA, any Supplemental Agreement and/or this Agreement, in whole or in part, notwithstanding the duration clause contained in Article 35 of the NMATA.

7. Parent agrees that all grievances or disputes concerning the interpretation or application of this Agreement shall be resolved in final and binding arbitration before the Board of Arbitration established in Article 33, Section 3 of the NMATA and pursuant to the procedure described in Article 33, Section 3 of the NMATA. Parent hereby expressly agrees to voluntarily submit to and be fully bound by the expedited arbitration and information exchange procedures established in Article 33, Sections 3 and 4 of the NMATA in all respects as if every reference to the term "Employer" in those Sections also expressly refers to, includes and binds Parent. However, it is understood and agreed that Parent is not a signatory to the NMATA or any of its various supplements and is not, solely by virtue of this Agreement, single or joint employer with the signatory Employer(s).

8. In the event Union submits a grievance involving Parent and/or Employer under the expedited arbitration procedure established in Article 33, Section 3, Parent and Employer and Union shall provide all information, documents or materials that are relevant in any way to the Union's grievance within fifteen (15) days of the receipt of any written request for such information, documents or materials by the Union, Parent, or Employer. If, and to the extent that, the Parent, the Employer or the Union fails or refuses to comply with this request for information, for any reason, the Parent, the Employer or the Union may request a subpoena duces tecum from the majority of the Board of Arbitration requiring that the information be produced by the Parent, the Employer or the Union or any other entity or person. If, and to the extent that the subpoenaed party fails or refuses to comply with a subpoena issued by the majority of the Board of Arbitration, the Union, the Parent or the Employer may seek enforcement of the subpoena in federal court pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended. If, and to the extent Parent, Employer or Union fails to comply with this provision for any reason, the Union, Parent or Employer may argue that the Board of Arbitration should draw an adverse inference against Parent, Employer or Union concerning the subject matter of the information that Parent, Employer or Union has failed to provide to Union, Parent or Employer within fifteen (15) days.

9. The Parent and Employer's obligations under this Agreement shall be binding upon its successors, administrators, executors and assigns. The Parent and Employer agree that the obligations of this Agreement shall be included in the agreement of sale, transfer or assignment of the business. In the event an entire operation or a portion thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. Transactions covered by this provision include stock sales or exchanges, mergers, consolidation or spin-offs or

any other method by which business is transferred.

In the event the Parent or Employer fails to require the purchaser, the transferee or lessee to agree to assume the obligations of this Agreement, the parent or Employer (including partners thereof) shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement.

The Parent or Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee or other entity involved in the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which the operations covered by this Agreement may be transferred.

Such notice shall be in writing, with a copy to the Union, at the time the seller, transferor or lessor makes the purchase and sale negotiation known to the public or executes a contract or transaction as herein described whichever first occurs.  The Union shall also be advised of the exact nature of the transaction, not including financial details.

This section shall not impose any independent obligations under the NMATA, its supplements or this Agreement on any holding company that owns or controls Parent.

10. The following definitions shall apply to certain of the capitalized terms in this Agreement:

a. *Carhaul Work*.  The term "Carhaul Work" means and includes any and all present work and future work opportunities of the kind, nature and type currently, historically or traditionally performed by the Employer's bargaining unit employees in connection with the over-the-road transportation of motor vehicles, including without limitation the transportation of motor vehicles to or from automobile dealers, manufacturers, plants, railheads, ports or staging yards; associated loading and unloading work; associated shuttle work and releasing work; associated maintenance work and yard work; and any other work of the type performed by any employee classification covered by the NMATA and/or applicable Supplemental Agreements.  The parties agree and confirm that "Carhaul Work" is not limited to the specific work assignments presently, historically and hereafter performed by the Employer's bargaining unit employees but also includes any and all future work opportunities that are identical or similar in nature to such work and that the Employer's bargaining unit employees have the necessary skills and ability to perform.

110

b. *Controlled Affiliate.*  Any person or entity shall be deemed to be a "Controlled Affiliate" of Parent and/or Employer if Parent or Employer, whether directly or indirectly through common ownership or common management owns a majority ownership or majority voting interest in such entity and (i) maintains the power, right or authority to control, manage or direct such entity's day-to-day operations, or (ii) maintains the power, right or authority to assign, or direct the assignment, or veto or block the assignment of Carhaul Work to such entity, or to prevent such entity from performing Carhaul Work.

11. The rights and obligations created under this Agreement shall be in addition to those created under Article 33 of the NMATA.  This Agreement shall be incorporated into and printed with the NMATA.

12. This Work Preservation Agreement does not apply to Marysville Releasing, Inc., Auto Releasing, Inc. and Auto Terminals, Inc., whose operations are covered by separate collective bargaining agreements with Local Unions affiliated with the International Brotherhood of Teamsters.

13. This Agreement shall remain in full force and effect concurrently with the NMATA and shall not be altered, amended, cancelled or terminated by either Parent or Employer, except as provided for in Article 35 of the NMATA.

For the Parent:

CASSENS CORPORATION


By:_____

Its:_____

Dated:_____


For the Employer:

CASSENS TRANSPORT COMPANY


By:_____

Its:_____

Dated:_____

111

For the Union:

TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS
INDUSTRY NEGOTIATING COMMITTEE (TNATINC),
on behalf of itself and LOCAL UNIONS
affiliated with the International
Brotherhood of Teamsters


By:_____

Its:_____

Dated:_____


## JACK COOPER TRANSPORT CO., INC.
## WORK PRESERVATION AGREEMENT

This Work Preservation Agreement (the "Agreement") is made and entered into in accordance with Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, by and among the undersigned employers party to the 2008-2011 National Master Automobile Transporters Agreement (the "NMATA") as identified in Article 1, Section 1 of the NMATA and/or applicable Supplemental Agreements (hereinafter referred to as "Employer"), and the undersigned Local Unions affiliated with the International Brotherhood of Teamsters that are parties to the NMATA as identified in Article 1, Section 2 of the NMATA and the Teamsters National Automobile Transporters Industry Negotiating Committee ("TNATINC") (hereinafter collectively referred to as "Union").

1. Union and Employer enter into this Work Preservation Agreement for the purpose of protecting and preserving Carhaul Work for the Employer's bargaining unit employees, eliminating contracting and double breasting practices under which Parent or Employer permit persons other than Employer's bargaining unit employees to perform Carhaul Work, and preventing any scheme or subterfuge to avoid the protection and preservation of Carhaul Work under this Agreement.

2. Employer agrees that it shall not undertake to, nor permit any Controlled Affiliate (including freight broker companies) to, subcontract, transfer, lease, divert, contract, assign or convey, in full or in part, any Carhaul Work to any Controlled Affiliate, plant, business, person or non-unit employees other than Employer, or to any other mode of operation, except as explicitly and specifically provided for and permitted in the NMATA and/or applicable Supplemental Agreements.

112

3. Employer agrees that it shall not permit any Controlled Affiliate other than Employer to perform any Carhaul Work and that no Carhaul Work shall be performed by any Controlled Affiliate other than Employer, except as permitted herein. In addition to the obligations of the Agreement, Employer agrees that Vehicle Processing and Distribution, Inc. ("VPD"), a controlled affiliate of Employer, shall not perform Carhaul Work, except in accordance with the provisions of this Agreement and the NMATA.

4. Employer agrees that it will not engage in any scheme, transaction, restructuring or reorganization that permits it or any Controlled Affiliate either to evade the protection of Carhaul Work for Employer's bargaining unit employees under this Agreement or to perform or assign or to permit the performance or assignment of any Carhaul Work outside the terms and conditions of this Agreement, the NMATA and applicable Supplemental Agreements, except as permitted herein. The Parent and/or Employer shall give written notification to the Union within fifteen (15) working days of the effective date of any acquisition (i.e. majority interest) by the Parent or Employer of any entity engaged in Carhaul Work as defined in Paragraph 10 (a) of this Work Preservation Agreement.

5. Employer and Union waive any and all rights to assert that this Agreement or Article 33 of the NMATA violates any law or legal principle. Neither party will bring any legal challenge or action of any form concerning the validity of this Agreement or Article 33 of the NMATA, nor permit any Controlled Affiliate to bring any such legal action, nor voluntarily provide any support to any person or entity that brings any such legal action; provided, however, that nothing in this paragraph 5 shall be construed to prohibit Union, Employer or any Controlled Affiliate from responding to a properly issued subpoena or similar legal process.

6. In the event that any provision of this Agreement or Article 33 of the NMATA is voided, invalidated or enjoined by a final decision of any court or government agency, then (a) the parties intend and agree that this Agreement shall be construed to provide the Union and the Employer's bargaining unit employees with the broadest permissible work preservation protection against subcontracting and double breasting practices consistent with governing law, and (b) Union and Employer shall each have the option to reopen collective bargaining negotiations over the NMATA, any Supplemental Agreement and/or this Agreement, in whole or in part, notwithstanding the duration clause contained in Article 35 of the NMATA.

7. All grievances or disputes concerning the interpretation or application of this Agreement shall be resolved in final and binding arbitration before the Board of Arbitration established in Article 33, Section 3 of the NMATA and pursuant to the procedure described in Article 33, Section 3 of the NMATA.

8. In the event Union submits a grievance involving Employer under the expedited arbitration procedure established in Article 33, Section 3, Employer and Union shall provide all information, documents or materials that are relevant in any way

to the Union's grievance within fifteen (15) days of the receipt of any written request for such information, documents or materials by the Union or Employer. If, and to the extent that, the Employer or the Union fails or refuses to comply with this request for information, for any reason, the Employer or the Union may request a subpoena duces tecum from the majority of the Board of Arbitration requiring that the information be produced by the Employer or the Union or any other entity or person. If, and to the extent that the subpoenaed party fails or refuses to comply with a subpoena issued by the majority of the Board of Arbitration, the Union or the Employer may seek enforcement of the subpoena in federal court pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended. If, and to the extent Employer or Union fails to comply with this provision for any reason, the Union or Employer may argue that the Board of Arbitration should draw an adverse inference against Employer or Union concerning the subject matter of the information that Employer or Union has failed to provide to Union or Employer within fifteen (15) days.

9. The Employer's obligations under this Agreement shall be binding upon its successors, administrators, executors and assigns. The Employer agrees that the obligations of this Agreement shall be included in any agreement of sale, transfer or assignment of the business. In the event an entire operation or a portion thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. Transactions covered by this provision include stock sales or exchanges, mergers, consolidation or spin-offs or any other method by which business is transferred.

In the event the Employer fails to require the purchaser, the transferee or lessee to agree to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement.

The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee or other entity involved in the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which the operations covered by this Agreement may be transferred.

Such notice shall be in writing, with a copy to the Union, at the time the seller, transferor or lessor makes the purchase and sale negotiation known to the public or executes a contract or transaction as herein described, whichever first occurs. The Union shall also be advised of the exact nature of the transaction, not including financial details.

This section shall not impose any independent obligations under the NMATA, its supplements or this Agreement on any holding company that owns or controls Parent.

10. The following definitions shall apply to certain of the capitalized terms in this Agreement:

a. *Carhaul Work*.  The term "Carhaul Work" means and includes any and all present work and future work opportunities of the kind, nature and type currently, historically or traditionally performed by the Employer's bargaining unit employees in connection with the over-the-road transportation of motor vehicles, including without limitation the transportation of motor vehicles to or from automobile dealers, manufacturers, plants, railheads, ports or staging yards; associated loading and unloading work; associated shuttle work and releasing work; associated maintenance work and yard work; and any other work of the type performed by any employee classification covered by the NMATA and/or applicable Supplemental Agreements.  The parties agree and confirm that "Carhaul Work" is not limited to the specific work assignments presently, historically and hereafter performed by the Employer's bargaining unit employees but also includes any and all future work opportunities that are identical or similar in nature to such work and that the Employer's bargaining unit employees have the necessary skills and ability to perform.

b. *Controlled Affiliate*.  Any person or entity shall be deemed to be a "Controlled Affiliate" of Employer if Employer, whether directly or indirectly through common ownership or common management owns a majority ownership or majority voting interest in such entity and (i) maintains the power, right or authority to control, manage or direct such entity's day-to-day operations, or (ii) maintains the power, right or authority to assign, or direct the assignment, or veto or block the assignment of Carhaul Work to such entity, or to prevent such entity from performing Carhaul Work.

11. The rights and obligations created under this Agreement shall be in addition to those created under Article 33 of the NMATA.  This Agreement shall be incorporated into and printed with the NMATA.

12. This Agreement shall remain in full force and effect concurrently with the NMATA and shall not be altered, amended, canceled or terminated by Employer, except as provided for in Article 35 of the NMATA.

For the Employers:

JACK COOPER TRANSPORT CO., INC.
PACIFIC MOTOR TRUCKING COMPANY


By:_____

Its:_____

Dated:_____

115

For the Union:

TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS
INDUSTRY NEGOTIATING COMMITTEE (TNATINC),
on behalf of itself and LOCAL UNIONS
affiliated with the International
Brotherhood of Teamsters


By:_____

Its:_____

Dated:_____

116